No. 26-1099

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA

In re Radio Television Digital News Association, Rachelle B. Chong, Ervin S. Duggan, Mark S. Fowler, Alfred C. Sikes, Thomas E. Wheeler, Christopher J. Wright, Kathryn C. Brown, Jerald N. Fritz, *Petitioners*.

# PETITION FOR WRIT OF MANDAMUS
# TO THE FEDERAL COMMUNICATIONS COMMISSION

Rachel Goodman
Janine M. Lopez
Tobin Raju
Conor S. Gaffney
**Protect Democracy Project**
2020 Pennsylvania Avenue NW
Suite 163
Washington DC 20006
(202) 579-4582

Andrew Jay Schwartzman
**Andrew Jay Schwartzman, PLLC**
525 9th Street NW, Seventh Floor
Washington, DC, 20004

Gigi Sohn
**G Squared Strategies**
3503 Alton Place, NW
Washington, DC 20008

Berin Szóka
**TechFreedom**
1500 K Street NW, Floor 2
Washington DC, 20005

*Counsel for Petitioners*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A. Parties**

Petitioners are Radio Television Digital News Association, Rachelle B. Chong, Ervin S. Duggan, Mark S. Fowler, Alfred C. Sikes, Thomas E. Wheeler, Christopher J. Wright, Kathryn C. Brown, and Jerald N. Fritz.

Respondent is the Federal Communications Commission.

Other parties before the agency in the proceeding below are: Dennis R. Patrick and Peter Pitsch.[1]

**B. Ruling Under Review**

This is an original action challenging the Commission's unreasonable delay in taking action on the Petitioners' November 13, 2025 Petition for Special Relief seeking repeal of the news distortion policy. Petitioners seek a writ of mandamus compelling the Commission to take action on the Petition for Special Relief within 90 days of this Court's decision. Because the Commission has not taken any action on the Petition for Special Relief, no citation to the Federal Register or other record exists.

---

[1] Andrew C. Barrett, who was a party to the proceeding below, passed away before the filing of this petition.

**C.    Related Cases**

This case has not previously come before this Court or any other, and counsel for Petitioners is not aware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioner Radio Television Digital News Association, a professional association dedicated exclusively to broadcast and digital journalism, certifies that it has no parent companies within the meaning of Circuit Rule 26.1(a), and that no publicly held company holds 10% or greater ownership interest.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

CORPORATE DISCLOSURE STATEMENT........................................................ iii

TABLE OF CONTENTS .................................................................................iv

TABLE OF AUTHORITIES ...........................................................................vi

GLOSSARY OF ABBREVIATIONS ...............................................................xi

INTRODUCTION...........................................................................................1

STATEMENT OF JURISDICTION.................................................................4

RELIEF SOUGHT ..........................................................................................4

ISSUE PRESENTED .......................................................................................5

STATEMENT OF THE CASE .........................................................................5

    I.    The news distortion policy. ..................................................................5

    II.   The Commission's recent use of the news distortion policy for partisan purposes has chilled speech and journalism. ........................................8

    III.  The Petition for Special Relief asks the Commission to rescind the news distortion policy. ..................................................................................13

    IV.  The Chairman immediately indicates no review is forthcoming, and the Commission takes no action. ...............................................................15

    V.   Powers of the Chairman and Commission practice. ...................................18

ARGUMENT ................................................................................................20

    I.    The Commission has a clear legal duty to decide the News Distortion Petition. .............................................................................................21

    II.   The Commission's inaction on the News Distortion Petition warrants mandamus relief..................................................................................25

      A.  The Commission's inaction constitutes an agency decision to not respond to the petition..................................................................................25

      B.  The Commission has unreasonably delayed acting on the News Distortion Petition..................................................................................26

III.  The Petitioners have no adequate alternative remedy. .............................33

CONCLUSION .........................................................................................34

CERTIFICATE OF COMPLIANCE ..............................................................36

CERTIFICATE OF SERVICE..........................................................................37

# TABLE OF AUTHORITIES

**CASES**

*Abrego Garcia v. Noem*,
   777 F. Supp. 3d 501 (D. Md. 2025) .................................................................10

*Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*,
   750 F.2d 81 (D.C. Cir. 1984) .........................................................................20

*Ams. for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021) .......................................................................................31

*Campaign Legal Ctr. v. Iowa Values*,
   573 F. Supp. 3d 243 (D.D.C. 2021) ...............................................................31

*Cox Broad. Corp. v. Cohn*,
   420 U.S. 469 (1975) .......................................................................................31

*Elrod v. Burns*,
   427 U.S. 347 (1976).................................................................................30, 34

*Env't Defense Fund, Inc. v. Hardin*,
   428 F.2d 1093 (D.C. Cir. 1970) .....................................................................25

*FCC v. League of Women Voters of California*,
   468 U.S. 364 (1984) .......................................................................................30

*Galloway v. FCC*,
   778 F.2d 16 (D.C. Cir. 1985) ...........................................................................6

*GTE Serv. Corp. v. FCC*,
   782 F.2d 263 (D.C. Cir. 1986) ...........................................................22, 23, 27

*In re Am. Rivers and Idaho Rivers United*,
   372 F.3d 413 (D.C. Cir. 2004) ...........................................................23, 24, 27

*In re Core Commc'ns, Inc.*,
   531 F.3d 849 (D.C. Cir. 2008) .......................................................................20

*In re Ctr. for Biological Diversity*,
    53 F.4th 665 (D.C. Cir. 2022) ........................................................20, 32, 33

*In re Monroe Commc'ns Corp.*,
    840 F.2d 942 (D.C. Cir. 1988) ....................................................................33

*In re Murphy-Brown, LLC*,
    907 F.3d 788 (4th Cir. 2018).......................................................................21

*In re Pub. Emps. for Env't Resp.*,
    957 F.3d 267 (D.C. Cir. 2020) ........................................................20, 27, 28

*Karimova v. Abate*,
    No. 23-5178, 2024 WL 3517852 (D.C. Cir. July 24, 2024) ........................23

*Khan v. Baker*,
    No. 24-CR-271-RCL, 2025 WL 958312 (D.D.C. Mar. 31, 2025)................28

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
    336 F.3d 1094 (D.C. Cir. 2003) .................................................................24

*Media Matters for Am. v. Paxton*,
    138 F.4th 563 (D.C. Cir. 2025) ..................................................................31

*Miami Herald Pub. Co. v. Tornillo*,
    418 U.S. 241 (1974) ...................................................................................29

*Mills v. Alabama*,
    384 U.S. 214 (1966) ...................................................................................31

*Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*,
    460 U.S. 575 (1983) ...................................................................................29

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ...................................................................8, 14, 28, 29

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ...................................................................................31

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ..................................................................................23, 24

*Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*,
475 U.S. 1 (1986) ..........................................................................................29

*Potomac Elec. Power Co. v. I.C.C.*,
702 F.2d 1026 (D.C. Cir. 1983) ....................................................................27

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969) ......................................................................................32

*Richmond Newspapers v. Virginia*,
448 U.S. 555 (1980) ......................................................................................29

*Serafyn v. FCC*,
149 F.3d 1213 (D.C. Cir. 1998) ......................................................................1

*Sierra Club v. Thomas*,
828 F.2d 783 (D.C. Cir. 1987) ................................................................25, 26

*Telecomms. Rsch. & Action Ctr. v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) .....................4, 5, 20, 21, 25, 27, 28, 32, 33, 34

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ...................................................................................8, 30

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ......................................................................................28

**STATUTES**

5 U.S.C. § 555(b) ..................................................................................23, 27

28 U.S.C. § 1651(a)................................................................................4, 24

28 U.S.C. § 2343 ........................................................................................4

47 U.S.C § 303(r) ........................................................................................1

47 U.S.C. § 154(i) .............................................................................21, 22, 27

47 U.S.C. § 154(j) ........................................................................21, 22

47 U.S.C. § 155(a) .............................................................................18

47 U.S.C. § 326 ............................................................................15, 29

47 U.S.C. § 402(a) ..........................................................................4, 24

**OTHER AUTHORITIES**

*Broad. News Distortion*, FCC (July 18, 2024) ...........................................5

Chad Raphael, *The FCC's Broadcast News Distortion Rules: Regulation by Drooping Eyelid*, 6 Commc'n L. & Pol'y 485 (2001) ..........................................1, 7

*Informal Timeline for Consideration of Applications for Transfers or Assignments of Licenses or Authorizations Relating to Complex Mergers* .................................11

Joel Timmer, *Potential FCC Actions Against "Fake News": The News Distortion Policy and the Broadcast Hoax Rule*, 24 Commc'n L. & Pol'y 1 (2019) ...........1, 7

**REGULATIONS**

47 C.F.R. § 0.283 ..........................................................................2, 19

47 C.F.R. § 0.3 ..........................................................21, 22, 23, 24, 27

47 C.F.R. § 0.5(c) ..............................................................................19

47 C.F.R. § 73.1217 ...........................................................................15

**ADMINISTRATIVE PROCEEDINGS**

*Free Press Emergency Petition for Inquiry Into Broad. of False Info. on COVID-19, Letter*, 35 FCC Rcd. 3032 (MB & OGC 2020)................................................7

*In re Complaint by Mrs. J. R. Paul*, 26 F.C.C.2d 591 (1969) ................................6

*In re Complaint Concerning Network Coverage of the Democratic Nat'l Convention*, 16 F.C.C.2d 650 (1969) ......................................................7

*In re Complaint of Syracuse Peace Council*, 2 F.C.C. Rcd. 5043 (1987)...............14

*In re Complaints Covering CBS Program "Hunger in Am.,"* 20 F.C.C.2d 143 (1969) ......................................................................................6

*In re: Delete, Delete, Delete,* Docket No. 25-133 (Mar. 12, 2025) .........................32

*News Distortion Complaint Involving CBS Broad. Inc., licensee of WCBS, New York, NY*, 40 FCC Rcd. 565 (EB 2025)..............................................................8, 9

*News Distortion Complaint Involving WPVI Television (Philadelphia), LLC, licensee of WPVI-TV, Philadelphia, PA*, 40 FCC Rcd. 564 (EB 2025) ....................9

*Rep. on Editorializing by Broad. Licensees*, 13 F.C.C. 1246 (1949).........................5

# GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
|---|---|
| Add. | Addendum |
| FCC | Federal Communications Commission |
| RTDNA | Radio Television Digital News Association |

**INTRODUCTION**

The First Amendment generally prohibits the government from imposing content-based restrictions on speech. Despite this general prohibition, the Federal Communications Commission (the "Commission") has long sought to regulate the content of broadcasts in limited ways to further various Congressional mandates, including that the Commission manage the nation's airwaves in the "public interest." 47 U.S.C § 303(r). One of the content-regulation tools the Commission has developed is the "news distortion policy," which authorizes the Commission to sanction broadcasters who deliberately "distort" or "slant" the news. *See Serafyn v. FCC*, 149 F.3d 1213, 1216–17 (D.C. Cir. 1998).

For most of its life, the news distortion policy lay dormant. Cognizant of constitutional dangers of judging the accuracy of the news, the Commission applied the policy sparingly, rarely invoking the policy and even more rarely finding that a broadcaster had violated it.[2]

But in January 2025, the Chairman and the Commission he effectively controls, *see infra* at 18–20, adopted a more aggressive, and seemingly selective,

---

[2] *See* Chad Raphael, *The FCC's Broadcast News Distortion Rules: Regulation by Drooping Eyelid*, 6 Commc'n L. & Pol'y 485, 501 (2001) (only eight cases finding news distortion between 1969 and 1999, or 10% of complaints); Joel Timmer, *Potential FCC Actions Against "Fake News": The News Distortion Policy and the Broadcast Hoax Rule*, 24 Commc'n L. & Pol'y 1, 20 (2019) (no findings of news distortion since 1999).

approach to enforcing the news distortion policy. At the direction of Chairman Brendan Carr, the Commission reopened news distortion complaints that it had previously found lacked merit, but only against certain broadcasters. The Chairman used pending news distortion investigations to extract editorial concessions from broadcasters who needed Commission approval to merge. The Chairman repeatedly issued forceful public threats that certain editorial choices, and even covering certain topics, constituted news distortion. Referring to Kilmar Ábrego Garcia—the person at the center of a controversial immigration enforcement action—as a "Maryland man," for instance, was, the Chairman claimed, news distortion and could cost a station its license. Add. 36.

It became clear that this policy was now being applied in violation of the First Amendment. Moreover, this pattern of abuse, and the Chairman's newly expansive view of the Commission's powers, was broadly chilling the speech of broadcasters, even those who have not yet been targeted by the Commission.

On November 13, 2025, a bipartisan group of former Commission chairs, commissioners, and senior-level staff filed a Petition for Special Relief with the Commission seeking the repeal of the news distortion policy (hereinafter the "News Distortion Petition" or "Petition"). Because agency staff lack authority to change agency precedent, *see* 47 C.F.R. § 0.283, the petitioners filed the News Distortion Petition with the full Commission for disposition. That same day, the

Chairman posted to X in response to the Petition: "How about no[.] On my watch, the FCC will continue to hold broadcasters accountable to their public interest obligations." Add. 60. This comment from the Chairman—who has the exclusive power to present any matter, including the News Distortion Petition, to the full Commission—made clear that there would be no review whatsoever of the Petition.

Sure enough, the Commission has taken no action on the News Distortion Petition since it was filed last year. But through repeated public statements by the Chairman and threats of adverse regulatory action, the news distortion policy has only grown into more of a cudgel to suppress the First Amendment rights of broadcasters, journalists, and the public who depend on an information environment free of government interference. Without ever presenting the Petition to the full Commission, the Chairman continues to wield the news distortion policy as a weapon to control news content and suppress viewpoints the government disfavors. As the midterm elections approach, this abuse of regulatory power to shape voter perception and control information the electorate has access to is a particularly urgent matter.

This Court has exercised its power to compel the Commission to consider constitutional challenges to its content-regulation doctrines before. As the Chairman's threats escalate in the run-up to the midterm elections, this Court

3

should issue a writ of mandamus to compel the Commission to take prompt and final action on the News Distortion Petition.

The Petitioners meet the standard for this extraordinary remedy. Commission regulations and the Communications Act impose a clear duty on the Chairman and the Commission to take prompt action on matters like the News Distortion Petition. The ongoing and irreparable constitutional harms caused by the Chairman's abuse of the news distortion policy underscore the egregiousness of the agency's delay, warranting mandamus. And because only the full Commission can act on the Petition, and the Chairman has adamantly refused to present it to the Commission for a vote, the Petitioners have no remedy other than an order from this Court compelling the Commission to act.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 47 U.S.C. § 402(a) and 28 U.S.C. § 1651(a). *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 75–76 (D.C. Cir. 1984) ("*TRAC*"). Venue is proper under 28 U.S.C. § 2343.

## RELIEF SOUGHT

Petitioners seek an order from this Court granting this Petition and instructing the Commission to take final action on the News Distortion Petition within 90 days of this Court's decision. Petitioners also ask this Court to retain

jurisdiction over the matter to ensure the Commission's compliance. *TRAC*, 750

F.2d at 80–81.

## ISSUE PRESENTED

Whether this Court should issue a writ of mandamus compelling the

Commission to take action on the News Distortion Petition by a date certain.

## STATEMENT OF THE CASE

### I. The news distortion policy.

The news distortion policy bars certain deliberate misrepresentations by

broadcasters. Never formally promulgated as a rule, it developed through decades

of Commission adjudications. Broadcasters who are found to violate the policy can

face a number of sanctions from the Commission. See *Broad. News Distortion*,

FCC (July 18, 2024), https://perma.cc/RYJ7-UTSZ.

The roots of the news distortion policy lie in a 1949 Commission statement

that the Communications Act's public interest mandate forbids a broadcaster from

selecting "program material to distort or suppress the basic factual information

upon which any truly fair and free discussion of public issues must necessarily

depend." *Rep. on Editorializing by Broad. Licensees*, 13 F.C.C. 1246, 1254 (1949).

Over the next half century, and especially in the 1960s and 1970s, the Commission

refined this principle into the contemporary standard which has four elements, each

delicately designed to protect the First Amendment interests clearly implicated by

the policy. It is the pervasive disregard of those guardrails that impelled Petitioners to seek repeal of the news distortion policy.

First, there must be "deliberate distortion," as distinct from "mere inaccuracy or difference of opinion." *Galloway v. FCC*, 778 F.2d 16, 20 (D.C. Cir. 1985). Second, there must be extrinsic evidence (*i.e.*, beyond the broadcast itself) that the broadcaster *deliberately* distorted or staged the news. *In re Complaints Covering CBS Program "Hunger in Am.,"* 20 F.C.C.2d 143, 150 (1969). Third, the distortion must apply to a "significant event," rather than minor inaccuracies or incidental aspects of the report. *Galloway*, 778 F.2d at 20. And finally, extrinsic evidence must show that the distortion involved the "principals, top management, or news management" of the licensee, as opposed to other employees. *Hunger in Am.*, 20 F.C.C.2d at 150. The policy bars the Commission from investigating complaints of news distortion unless each of the four elements are credibly alleged.

Despite this high standard, the basic purpose of the news distortion policy remains to review the accuracy of the news. The Commission has long recognized the risks to a free press and free expression that such an undertaking represents, observing that "in a democracy, dependent upon the fundamental rights of free speech and press, no Government agency can authenticate the news, or should try to do so." *In re Complaint by Mrs. J. R. Paul*, 26 F.C.C.2d 591, 592 (1969). Reviewing the news for accuracy would require the Commission to "sit as a review

body of the 'truth' concerning news events," a subjective role that is plainly "not appropriate" for a government licensing agency. *In re Complaint Concerning Network Coverage of the Democratic Nat'l Convention*, 16 F.C.C.2d 650, 655 (1969). Accordingly, "the Commission does not—and cannot and will not—act as a self-appointed, free-roving arbiter of truth in journalism." *Free Press Emergency Petition for Inquiry Into Broad. of False Info. on COVID-19, Letter*, 35 FCC Rcd. 3032, 3033 (MB & OGC 2020). Invitations to misuse the news distortion policy to such ends have historically been forcefully rejected by the Commission. *See id.* at 3033 n.5 (collecting decisions).

Given these concerns, the Commission has, until recently, applied the news distortion policy sparingly and with decreasing frequency. Between 1969 and 2019, the Commission found only eight violations of the news distortion policy out of 120 complaints filed. Raphael, *supra* at 501; Timmer, *supra* at 20. Seven of those were between 1969 and 1985. Raphael, *supra* at 501. In the last forty years the Commission has only found one instance of actionable news distortion. Timmer, *supra* at 20.

While the policy has lain idle, developments in First Amendment doctrine have called into question whether the Commission's application of the policy is even constitutional. The Supreme Court "has many times held, in many contexts, that it is no job for government to decide what counts as the right balance of

private expression—to 'un-bias' what it thinks biased[.]" *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). Rather, the First Amendment commits to the individual the power to "decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). In *Moody*, decided just two terms ago, a plurality of the Supreme Court opined there is no legitimate government interest—and therefore no permissible application under the First Amendment—in "correct[ing] the mix of speech" in order to "better balance the speech market." 603 U.S. at 740, 741. Yet this is precisely the interest that the Chairman, and the Commission he effectively controls, seek to advance with the news distortion policy.

**II.      The Commission's recent use of the news distortion policy for partisan purposes has chilled speech and journalism.**

Over the past sixteen months, the Commission has broken with its longstanding practice of caution and adopted an aggressive, and selective, approach to invoking and enforcing the news distortion policy.

On January 22, 2025, the Commission staff, which operate under the exclusive control of the Chairman, re-opened two news distortion matters that the staff under the direction of the prior Chair had previously closed, docketing one arising from a *60 Minutes* interview for public comment. *News Distortion Complaint Involving CBS Broad. Inc., licensee of WCBS, New York, NY*, 40 FCC

Rcd. 565 (EB 2025); *News Distortion Complaint Involving WPVI Television (Philadelphia), LLC, licensee of WPVI-TV, Philadelphia, PA*, 40 FCC Rcd. 564 (EB 2025). The complaints were against stations owned and operated by CBS and ABC. The Commission staff had previously rejected the complaints "as at odds with the First Amendment," but reversed course under Chairman Carr's leadership, claiming they had been dismissed prematurely and required "further consideration." Add. 33 (also available at: https://perma.cc/L7NP-WM4Z). Notably, the Chairman did not direct staff to re-open another complaint involving coverage favorable to the current administration, which it had previously dismissed alongside the complaints against CBS and ABC on the same grounds. *Id*. This suggests that the viewpoints of the networks, rather than the merits of the complaints, were the reason for reviving the proceedings.

In April 2025, the Chairman invoked the news distortion policy in response to the content of a news broadcast. On X, the Chairman accused Comcast affiliates of engaging in news distortion by referring to Kilmar Ábrego Garcia—a Maryland resident whom the administration had wrongfully deported to a notorious prison in El Salvador—as a "Maryland man." Add. 36 (also available at: https://perma.cc/Z2VG-XUSR). According to the Chairman, this phrase was inaccurate because Ábrego Garcia was "validated as a member of the violent

MS13 gang," a claim that was deeply contested even at the time.[3] The Chairman

warned that there could be consequences: "Comcast knows that federal law

requires its licensed operations to serve the public interest. News distortion doesn't

cut it." *Id*.

These threats and investigations soon had clear effects on broadcasters'

editorial judgments and programming decisions. Under the cloud of the re-opened

news distortion complaint, CBS's flagship news program *60 Minutes* saw

departures of several high-profile editors. The longtime executive producer

resigned in April 2025, writing that he was no longer able "[t]o make independent

decisions based on what was right for 60 Minutes, right for the audience." Add. 39

(also available at: https://perma.cc/8LLS-KJ3H).

At the same time, Skydance Media had applied for permission to acquire

CBS News's parent company, Paramount. As the applications for approval

dragged on beyond the Commission's 180-day timeline,[4] observers began to

---

[3] Just days before the Chairman's post, a federal district court had found the claim "unsubstantiated." *Abrego Garcia v. Noem*, 777 F. Supp. 3d 501, 508 (D. Md. 2025). It observed that, "the 'evidence' against Abrego Garcia consisted of nothing more than his Chicago Bulls hat and hoodie, and a vague, uncorroborated allegation from a confidential informant claiming he belonged to MS-13's 'Western' clique in New York—a place he has never lived." *Id*. at 508 n.5.

[4] The Commission has an informal 180-day timeline for deciding applications for transfer. *See* FCC, *Informal Timeline for Consideration of Applications for Transfers or Assignments of Licenses or Authorizations Relating to Complex*

question whether the pending news distortion complaint against CBS, and a private civil lawsuit filed by the President premised on the same facts and theory, were behind the delay. Add. 44 (also available at: https://perma.cc/GT8T-UML9). These suspicions were confirmed when Skydance submitted a letter to the Chairman—not the full Commission—representing that it would conduct a review of the content of CBS's news coverage and install an ombudsman to investigate complaints of bias. Add. 51–52 (also available at: https://www.fcc.gov/ecfs/document/1072299913934/2).

Two days later, the Commission approved the applications. The Chairman immediately issued a victory statement, celebrating Skydance's concession to "root out the bias" from the "once storied CBS broadcast network." Add. 54 (also available at: https://docs.fcc.gov/public/attachments/DOC-413229A1.pdf).

The Commission continues to threaten broadcasters using the news distortion policy to this day. On March 14, 2026, the Chairman posted again to X to warn all broadcasters to "correct course" on their coverage of the war with Iran. Add. 57 (also available at: https://perma.cc/4E56-AAQH). Reposting a Truth Social post from the President calling coverage of a downed American refueling

---

*Mergers* (available at: https://perma.cc/UAF8-WGE6). The Commission took more than 300 days to approve Paramount's transfer application.

plane "fake news," the Chairman warned that such "fake news" was actionable news distortion that could result in the loss of a broadcast license. "The law is clear," the Chairman stated, "Broadcasters must operate in the public interest, and they will lose their licenses if they do not."



**Brendan Carr** ✔️
@BrendanCarrFCC

Broadcasters that are running hoaxes and news distortions - also known as the fake news - have a chance now to correct course before their license renewals come up.

The law is clear. Broadcasters must operate in the public interest, and they will lose their licenses if they do not.

And frankly, changing course is in their own business interests since trust in legacy media has now fallen to an all time low of just 9% and are ratings disasters.

The American people have subsidized broadcasters to the tune of billions of dollars by providing free access to the nation's airwaves.

It is very important to bring trust back into media, which has earned itself the label of fake news.

When a political candidate is able to win a landslide election victory after in the face of hoaxes and distortions, there is something very wrong. It means the public has lost faith and confidence in the media. And we can't allow that to happen.

Time for change!

In the context of a war—a matter of tremendous public concern—the Chairman's threat to scrutinize the news for conformity with the administration's narrative has a particularly chilling effect.

12

So, too, in the context of the midterm elections, which are fast approaching. The Chairman's naked attempts to suppress coverage the Administration views as unfavorable pose serious threats to the First Amendment and to our democratic order. The Chairman understands that the stakes of the midterms are high for the Administration. Thin majorities in Congress hang in the balance—and with them committee leadership, the ability to enact a legislative agenda, and the power to exercise oversight of the executive. The Chairman's abuse of the news distortion policy itself distorts the information voters have to make their choice, threatening the fairness of the midterms.

**III.    The Petition for Special Relief asks the Commission to rescind the news distortion policy.**

On November 13, 2025, a bipartisan group of former FCC commissioners, chairs, and senior-level staff filed a Petition for Special Relief with the Commission seeking the policy's repeal.[5] Add. 1–19. The Petition presented five reasons for repeal.

*First*, the Petition argued, the Supreme Court has questioned whether the basic purpose of the news distortion policy—to correct inaccurate or distorted news—is a legitimate government interest. As the Court recently put it, "this Court

---

[5] Petitioner Radio Television Digital News Association joined the Petition for Special Relief on April 20, 2026. Add. 20.

has many times held, in many contexts, that it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences." *Moody*, 603 U.S. at 719. As the First Amendment only countenances restrictions on speech that serve some legitimate government interest, misapplication of the news distortion policy fails this constitutional test.

*Second*, the Petition asserted that the application of the news distortion policy separately violates the First Amendment because of its chilling effect on broadcaster speech. This rationale was one of the bases for the Commission's repeal of the fairness doctrine, cousin to the news distortion policy, in 1987. *See In re Complaint of Syracuse Peace Council*, 2 F.C.C. Rcd. 5043, 5049–50 (1987). The Petition recounted the broad chilling effects of the Chairman's abuse of the news distortion policy. As further evidence, Petitioner RTDNA's members have modified the content of their coverage, reassigned reporters, and been subjected to increased editorial scrutiny because of the Chairman's abuse of the news distortion policy. Add. 21.

*Third*, the Petition described how the news distortion policy has shown itself to be susceptible to partisan weaponization. Relying on the facts described above, the Petition argued that the Commission, at the direction of the Chairman, has enforced the news distortion policy selectively against broadcasters and coverage

the current administration disfavors. Such partisan use of regulatory authority contravenes not only the First Amendment, but the Communications Act's limitations on the Commission's powers as well. *See* 47 U.S.C. § 326.

*Fourth*, the Petition argued that the news distortion policy is overly vague. It noted that the Commission's decision to re-open the news distortion complaints that do not meet the policy's standard has only heightened confusion among broadcasters as to what the policy proscribes.

*Fifth*, the Petition argued that the news distortion policy serves no critical regulatory purpose. The policy has only been applied eight times, and only once in the last forty years. The Commission's broadcast hoax rule, 47 C.F.R. § 73.1217, which proscribes a narrower set of false speech, provides adequate authority to the Commission to regulate dangerous broadcasts and rests on distinct, valid government interests regarding public safety, not balance or bias. In light of that rule, the news distortion policy is unnecessary.

## IV. The Chairman immediately indicates no review is forthcoming, and the Commission takes no action.

The News Distortion Petition was filed on November 13, 2025. That same day, the Chairman posted to X in response to an NBC news article about the Petition, "How about no[.] On my watch, the FCC will continue to hold

broadcasters accountable to their public interest obligations." Add. 60 (also available at: https://perma.cc/2Q79-MF7U).



**Brendan Carr** @BrendanCarrFCC

How about no

On my watch, the FCC will continue to hold broadcasters accountable to their public interest obligations.

And it is quite rich for the exact same people that pressured prior FCCs to censor conservatives *through the news distortion policy* to now object to the agency's even-handed application of the law.

>  **NBC News** @NBCNews · Nov 13, 2025
> A bipartisan group of former FCC leaders petitions the agency to repeal the policy the Trump administration invoked in discussions surrounding Jimmy Kimmel at ABC and in the investigation of "60 Minutes" at CBS. nbcnews.com/tech/tech-news...

1:36 PM · Nov 13, 2025 · **153.3K** Views

The next day, the Chairman posted a thumbs down emoji in response to a Washington Post article about the Petition. Add. 63 (also available at: https://perma.cc/763T-JJEQ).



**Brendan Carr** ✓
@BrendanCarrFCC

 👎



**The Washington Post** ✓        🅧.com
@washingtonpost

Seven former members of the FCC are petitioning the agency to repeal its policy prohibiting broadcasters from distorting the news, arguing that FCC Chairman Brendan Carr has improperly wielded it to counter material critical of President Trump.

Brendan Carr should ditch speech-chilling policy, former FCC...

From washingtonpost.com

2:30 PM · 11/13/25 · **32K** Views

1:12 PM · Nov 14, 2025 · **26.8K** Views

The Chairman's responses indicated that no Commission review of the Petition would be forthcoming. And none has. As explained in the attached declaration of Ruth Milkman, the Chairman controls the Commission's docket. Under his direction the Commission has not docketed the petition, acknowledged receipt, solicited comment, or given any other indication that the agency has begun to take action on the Petition. Other than the Chairman's two social media posts

17

immediately following filing, there has been no action from the Commission in the several months the agency has had the Petition.

## V.     Powers of the Chairman and Commission practice.

Under the Communications Act, Commission rules, and longstanding Commission practice, the Chairman exclusively controls the procedure for agency action on the News Distortion Petition.

47 U.S.C. § 155(a) provides that the Chairman "shall be the chief executive officer of the Commission. It shall be his duty to preside at all meetings and sessions of the Commission . . . and generally to coordinate and organize the work of the Commission in such manner as to promote prompt and efficient disposition of all matters within the jurisdiction of the Commission."

Although there are no specific Commission rules governing procedure or administration of petitions for special relief like the News Distortion Petition, as a matter of agency practice the Chairman exercises complete control over the presentation of matters like the News Distortion Petition to the full Commission for consideration. Add. 25. Consistent with the Chairman's statutory designation as chief executive officer, Commission practice defers complete control over the agency's staff and agenda to the Chairman. *Id*. The Chairman determines whether and when matters are presented to the full Commission for action. *Id*. There is no mechanism for other commissioners to bring a matter to the full Commission. *Id*.

18

The Chairman also selects all senior staff, including office heads and bureau chiefs, who draft Commission decisions at the direction and under the supervision of the Chairman. *Id*. These decisions are then presented to the full Commission with a recommended outcome. *Id*.

The Commission has adopted rules delegating some functions to the chiefs of the various bureaus, with the general limitation that this authority extends only to "matters which are minor or routine or settled in nature and those in which immediate action may be necessary." 47 C.F.R. § 0.5(c). Among these delegations is 47 C.F.R. § 0.283, which gives certain powers to the Chief of the Media Bureau. However, this rule specifies that five categories of "matters shall be referred to the Commission en banc for disposition[.]" One of those categories that are outside of the Media Chief's authority is set forth in Section 0.283(c): "matters that present novel questions of law, fact or policy that cannot be resolved under existing precedents and guidelines." Petitioners' News Distortion Petition falls into this category. As former Commission Chief of Staff Ruth Milkman explains in her Declaration:

> [B]ecause it calls for overruling an agency policy, the FCC staff cannot act on the petition under delegated authority. The Chairman has exclusive control over whether and any decision granting or

denying the Petition for Special Relief is presented to the full Commission for resolution. Add. 26.

Under this scheme, the Chairman decides when, if ever at all, the News Distortion Petition should be presented to the Commission for action. The Chairman's posts dismissing the Petition with "How about no," coupled with the absence of any movement from the Commission, make clear that the agency does not intend to take any action on the News Distortion Petition.

## ARGUMENT

It is "undisputed" that this Court has the authority to compel agency action unlawfully withheld or unreasonably delayed. *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008); *TRAC*, 750 F.2d at 75. Mandamus is the proper vehicle for such a request. *TRAC*, 750 F.2d at 75. This Court will grant a writ of mandamus when a petitioner establishes three things: (1) the agency has violated a clear duty to act; (2) the agency's delay in acting is so egregious as to warrant mandamus; and (3) the petitioner has no adequate alternative remedy. *In re Ctr. for Biological Diversity*, 53 F.4th 665, 670 (D.C. Cir. 2022). In this evaluation, "[n]o one factor is determinative, and '[e]ach case must be analyzed according to its own unique circumstances.'" *In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 273 (D.C. Cir. 2020) (quoting *Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Bd.*, 750 F.2d 81, 86, (D.C. Cir. 1984)).

Each of these elements is met here. The Chairman and Commission have a clear duty to take action on the News Distortion Petition under 47 C.F.R. § 0.3, 47 U.S.C. §§ 154(i), (j), and in light of the urgent and ongoing First Amendment harms caused by the Chairman's abuse of the news distortion policy. The Commission's inaction constitutes both unacknowledged agency action on the Petition and delay that is egregious under the *TRAC* factors, warranting mandamus in either case. And the Petitioners lack any alternative remedy to the acute and ongoing First Amendment injuries they are suffering under an agency policy that has suffused the Commission's entire regulatory regime.

Courts have recognized that "mandamus plays an important and necessary role in protecting First Amendment freedoms." *In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018). Mandamus is needed here, where each passing day of inaction from the Commission is another day Petitioners and the public suffer a violation of their First Amendment rights.

## I. The Commission has a clear legal duty to decide the News Distortion Petition.

The Commission has a clear duty to act promptly on the News Distortion Petition, particularly in the atypical circumstances of this case.

Commission regulations impose a clear duty on the Chairman "[t]o coordinate and organize the work of the Commission in such a manner as to promote prompt and efficient disposition of all matters within the jurisdiction of the Commission." 47 C.F.R. § 0.3(a)(4). This regulation effectuates the Commission's obligations under the Communications Act. 47 U.S.C. § 154(j) requires the Commission to "conduct its proceedings in such manner as will best conduce to the proper dispatch of business and to the ends of justice." In the ordinary course, Section 154(j) has often been construed to give the agency latitude in managing its affairs. *See, e.g.*, *GTE Serv. Corp. v. FCC*, 782 F.2d 263, 273 (D.C. Cir. 1986). However, there are constraints on that latitude: the Commission may abuse its discretion in circumstances of "*unreasonable delay or significant prejudice to the parties.*" *Id.* at 274 (emphasis added). Similarly, 47 U.S.C. § 154(i), entitled "Duties and powers," directs the agency to "perform any and all acts, ... and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions."

The News Distortion Petition is plainly a "matter[] within the jurisdiction of the Commission." 47 C.F.R. § 0.3(a)(4).[6] The Chairman, having prejudged the

---

[6] Section 0.3(a)(4) does not require prompt action on *any* petition for special relief or request to the Commission. Only those that are properly "matters within the jurisdiction of the Commission." The News Distortion Petition, which seeks the repeal of agency precedent, is such a matter.

merits of the Petition, is using his ability to block any action on it in direct contravention of his obligation to "promote prompt and efficient disposition" of the matter. *Id*. The meaning of "prompt" in this context must be assessed in light of both the Chairman's prejudgment of the Petition and the "significant prejudice" to the First Amendment rights of the Petitioners caused by his delay. *GTE Serv. Corp.*, 782 F.2d at 274. As discussed more fully below, *infra* at 28–33, the Commission's abuse of the news distortion policy poses substantial, ongoing, and irreparable First Amendment harms to Petitioners and the public. The Commission's inaction perpetuates these harms by allowing the news distortion policy to continue to chill broadcaster speech.

Once Congress or an agency (through regulation) has determined that some action is required, the APA requires that action be taken "within a reasonable time." 5 U.S.C. § 555(b). At a minimum, Section 555(b) augments the duty to decide the News Distortion Petition created by 47 C.F.R. § 0.3(a)(4), commanding the Commission to "proceed to conclude [the] matter presented to it."[7] Section

---

[7] At a maximum, Section 555(b) provides an independent source of a duty to act when agency inaction "thwarts the court's ability to review agency action." *Karimova v. Abate*, No. 23-5178, 2024 WL 3517852, at \*5 (D.C. Cir. July 24, 2024) (unpublished) (interpreting *In re Am. Rivers and Idaho Rivers United*, 372 F.3d 413 (D.C. Cir. 2004) in light of *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)). The Court should grant Petitioner's request for mandamus because the Commission has a clear duty to take action on the News Distortion Petition under its own regulations. In the alternative, the Commission has a duty to act because

555(b) further provides that this duty to act must be carried out "[w]ith due regard for the convenience and necessity of the parties or their representatives and within a reasonable time," not on the whims of the Chairman. As this Court has explained, this provision "imposes a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003). This duty to respond is mandatory, even if the ultimate decision on *how* to respond to the matter is within the agency's discretion. *Am. Rivers*, 372 F.3d at 418; *accord Norton*, 542 U.S. at 65 ("[W]hen an agency is compelled by law to act . . . but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be.").

The Chairman is obligated to act to ensure the "prompt . . . disposition" of the News Distortion Petition. 47 C.F.R. § 0.3(a)(4). Any contention that the Commission is "not obligated to address a petition filed under one of its own regulations . . . is without merit." *Am. Rivers*, 372 F.3d at 418. The Chairman's evident desire not to rule upon the Petition must yield to Petitioners' entitlement to a reviewable answer.

---

inaction thwarts this Court's jurisdiction, guaranteed by 47 U.S.C. § 402(a) and 28 U.S.C. § 1651(a).

**II.    The Commission's inaction on the News Distortion Petition warrants mandamus relief.**

This Court may issue a writ of mandamus to address agency inaction that impedes the Court's future review of final agency action. *TRAC*, 750 F.2d at 79; *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987). Inaction that warrants mandamus relief can include (1) inaction that represents final agency action that is not officially acknowledged; or (2) unreasonable delay of final action. *Sierra Club*, 828 F.2d at 793–94. Under either rubric, the Commission's inaction here provides compelling equitable grounds to grant mandamus relief.

**A. The Commission's inaction constitutes an agency decision to not respond to the petition.**

Agency inaction can have "precisely the same impact on the rights of the parties as denial of relief." *Id.* (citing *Env't Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970)). In such situations, the Court may issue a writ compelling the agency to take action on the petition because the Commission's inaction represents "effectively final agency action that the agency has not frankly acknowledged." *Id*. "[T]he court can undertake review as though the agency had denied the requested relief and can order an agency to either act or provide a reasoned explanation for its failure to act." *Id*. (quoting *Env't Defense Fund*, 428 F.2d at 1099).

Here, the Chairman's public statements about the Petition—remarking "How about no" and posting a thumbs down emoji in response to social media posts about the Petition—demonstrate that no agency action on the Petition will be forthcoming. *See supra* at 15–18. In fact, in the several months since it was filed, the Commission has neither acknowledged receipt of the Petition nor placed it on the docket. *See supra* at 17. The Commission cannot escape mandamus merely by "casting its decision in the form of inaction rather than in the form of an order denying relief" where no agency action is likely. *Sierra Club*, 828 F.2d at 793. The Court should issue a writ of mandamus addressing the agency's inaction.

### B. The Commission has unreasonably delayed acting on the News Distortion Petition.

Even if the Commission were to represent that it is still considering the News Distortion Petition, its delay is unreasonable and a writ of mandamus is needed to compel prompt agency action given the significant constitutional rights at stake. This Court has identified six non-exclusive factors for assessing unreasonable agency delay: (1) whether the agency's timeline is governed by a "rule of reason"; (2) statutory deadlines or "other indication" of the expected timeline; (3) whether the delay is in the "sphere of economic regulation" or impacts health and welfare; (4) the effect of granting mandamus on other agency priorities; (5) the nature and extent of the interests prejudiced by delay; and (6)

"any impropriety lurking behind" the agency's delay. *TRAC*, 750 F.2d at 80. The reasonableness of agency delay is not measured solely by the length of delay—no single factor is determinative, and "each case must be analyzed according to its own unique circumstances." *Pub. Emps. for Env't Resp.*, 957 F.3d at 273 (citation modified). Here, the weight of the *TRAC* factors supports a writ of mandamus.

*Factors one and two – nature of the delay.* The first and second *TRAC* factors assess whether the agency's response time is governed by an identifiable rationale, complies with any specified schedules, and are typically examined together. *See TRAC*, 750 F.2d at 80; *Potomac Elec. Power Co. v. I.C.C.*, 702 F.2d 1026, 1034 (D.C. Cir. 1983).

As explained above, the Commission abuses its discretion in managing its affairs in circumstances of "unreasonable delay or significant prejudice to the parties." *GTE Serv. Corp.*, 782 F.2d at 274; *see also* 47 C.F.R. § 0.3(a)(4) (requiring "prompt and efficient disposition" of all Commission matters); 47 U.S.C. § 154(i). The Administrative Procedure Act also requires the Commission to "conclude a matter" "within a reasonable time." 5 U.S.C. § 555(b). While there is "no per se rule as to how long is too long to wait for agency action," "a reasonable time for agency action is typically counted in weeks or months, not years." *Am. Rivers*, 372 F.3d at 419 (rejecting agency's argument that it was not required to respond to a petition requesting discretionary action); *accord Pub.*

27

*Emps. for Env't Resp.*, 957 F.3d at 274. The Commission's nearly six month-long delay combined with the remaining *TRAC* factors weigh in favor of mandamus relief.

 *Factors three and five – interests prejudiced*. The third and fifth *TRAC* factors are both concerned with the nature of the interests at issue and the extent to which they are prejudiced by agency delay, and are often considered together. *TRAC*, 750 F.2d at 80; *see also Khan v. Baker*, No. 24-CR-271-RCL, 2025 WL 958312, at *5 (D.D.C. Mar. 31, 2025). Here, the News Distortion Petition raises significant First Amendment concerns, Add. 9–16, that are irreparably prejudiced each day the Chairman misuses the news distortion policy to chill speech.

 The news distortion policy, as applied by the Chairman, strays far from the "fixed star of our constitutional constellation," "that no official, high, or petty, can prescribe what shall be orthodox in politics . . . or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). There are few greater dangers to free expression "than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana." *Moody*, 603 U.S. at 742 (explaining that the government "cannot prohibit speech to improve or better balance the speech market"). Given the significant constitutional interests implicated in the Petition, these factors weigh heavily in favor of mandamus relief.

28

At issue in the News Distortion Petition are the First Amendment rights of free speech, the public's corollary right to receive information, and the press's editorial discretion. The First Amendment recognizes that "[a]n untrammeled press is a vital source of public information, and an informed public is the essence of a working democracy." *Minneapolis Star & Trib. Co. v. Minn. Com'r of Revenue*, 460 U.S. 575, 585 (1983) (citation modified); *see also Richmond Newspapers v. Virginia*, 448 U.S. 555, 587–88 (1980) (Brennan, J. concurring) (recognizing that the press plays an important role in "fostering our republican system of self-government"). In furtherance of that core function of the press, the First Amendment prohibits interference with "the exercise of editorial control and judgment." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *accord Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1 (1986); *Moody*, 603 U.S. at 731. That prohibition extends to government attempts to "'un-bias' what it thinks biased." *Moody*, 603 U.S. at 719, which is precisely what the Petition asserts is the current effect of the news distortion policy. Add. 10–11.

These principles apply equally in the broadcast context, as Congress and the Supreme Court have repeatedly recognized that the Commission's regulatory authority is restrained by the First Amendment. *See* 47 U.S.C. § 326 (denying "the Commission the power of censorship" or the ability to "interfere with the right of free speech"); *FCC v. League of Women Voters of California*, 468 U.S. 364, 378

29

(1984) ("[T]he First Amendment must inform and give shape to the manner in which Congress exercises its regulatory power in this area . . . broadcasters are entitled under the First Amendment to exercise the widest journalistic freedom consistent with their public [duties].") (citation modified); *Turner Broad. Sys.,* 512 U.S. at 650 ("[T]he FCC's oversight responsibilities do not grant it the power to ordain any particular type of programming that must be offered by broadcast stations.").

Permitting the Commission to continue to ignore the News Distortion Petition will irreparably prejudice Petitioners and all broadcasters. The Chairman's abuse of the news distortion policy is chilling broadcasters' speech—incentivizing them to avoid coverage on controversial and partisan issues. Add. 10–11. The Petition cites multiple examples of the Chairman's intrusions on broadcasters' editorial discretion. Add. 11–15. Petitioner RTDNA's members have also "modified coverage, reassigned reporters, modified hiring decisions, adjusted coverage plans, and been subjected to increased editorial oversight" as a result of the news distortion policy and the Chairman's threats. Add. 21. The Chairman's weaponization of the news distortion policy has caused broadcasters to restrain their news coverage. As applied, the policy's chilling effect on speech violates the First Amendment and constitutes irreparable harm warranting relief. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for

30

even minimal periods of time, unquestionably constitutes irreparable injury.");

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021) (finding that a

donor disclosure requirement created an unnecessary risk of chilling speech in

violation of the First Amendment); *accord Media Matters for Am. v. Paxton*, 138

F.4th 563, 585 (D.C. Cir. 2025) (presuming irreparable harm where there is a First

Amendment injury).

The Chairman's continued threats to initiate investigations under the news

distortion policy months before the midterm elections underscore the urgent need

for the Commission to rule on the Petition. *See supra* at 13; *see also Campaign

Legal Ctr. v. Iowa Values*, 573 F. Supp. 3d 243, 253 (D.D.C. 2021) (assessing

*TRAC* factors three and five and explaining that "threats to the health of our

electoral processes also require timely attention"). The press plays an essential role

in "keeping officials elected by the people responsible to all the people whom they

were selected to serve." *Mills v. Alabama*, 384 U.S. 214, 219 (1966) (striking

down restrictions on the publication of newspaper editorials). It does this in part by

providing information necessary "to vote intelligently or to register opinions on the

administration of government generally." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469,

491–92 (1975); *see also N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964)

(underscoring role of the press in enabling the "public discussion of the

stewardship of public officials"). The news distortion policy has chilled, and

31

continues to chill, robust news coverage. Add. 12–13; 21. That forgone coverage deprives voters of their right to receive information essential to democratic decision-making and undermines the press's essential role in our democracy.

*Factor four – effect on other agency priorities*. The fourth *TRAC* factor "generally cautions against facilitating line-jumping and reordering agency priorities." *Ctr. for Biological Diversity*, 53 F.4th at 672. Here, however, Petitioners are not seeking to cut the line or obtain relief that would benefit only themselves. The benefits of a ruling on the News Distortion Petition will inure to all broadcasters subject to the policy and to the public. *See Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969) ("It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here. That right may not constitutionally be abridged either by Congress or by the FCC."). Moreover, taking action on the News Distortion Petition would further a core priority of the Commission in eliminating rules that are either "unnecessary" or "affirmatively detrimental." FCC, *In re: Delete, Delete, Delete*, Docket No. 25-133 (Mar. 12, 2025) , https://docs.fcc.gov/public/attachments/DA-25-219A1.pdf. Multiple commenters, including the National Association of Broadcasters, have pointed to the news distortion policy as one such policy. Nat'l Ass'n of Broad. Comment Letter on In Re Delete, Delete, Delete, Docket No. 25-133 (Apr. 11, 2025),

https://nab.org/documents/newsRoom/pdfs/NAB_Comments_DeleteDeleteDelete_

Docket.pdf.

*Factor six – agency impropriety*. The Court "need not find any impropriety"

underlying the Commission's delay to grant mandamus relief. *TRAC*, 750 F.2d at

80. However, the Chairman's public statements about the News Distortion Petition

indicate that, at the least, he has prejudged the merits of the petition and that

Commission action on the Petition will not be forthcoming. Under his control, the

Commission has done nothing to indicate that it is reviewing the merits of the

Petition nor made "any credible attempt to deny the allegation that it is deliberately

dragging its feet." *In re Monroe Commc'ns Corp.*, 840 F.2d 942, 947 (D.C. Cir.

1988) (denying request for mandamus but retaining jurisdiction over case until the

FCC issued a final order).[8]

## III. The Petitioners have no adequate alternative remedy.

Petitioners "lack an adequate alternative remedy" to mandamus because "a

writ of mandamus is the only way to compel" the Commission to perform its duty

to decide the News Distortion Petition. *Ctr. for Biological Diversity*, 53 F.4th at

671. Mandamus represents Petitioners' only avenue to secure agency action on the

---

[8] Should this Court decline to issue a writ of mandamus, Petitioners respectfully request that, at a minimum, the Court retain jurisdiction over the case until the Commission rules on the News Distortion Petition.

vital constitutional questions raised in the News Distortion Petition, and mandamus is necessary for this Court "to protect its future jurisdiction." *TRAC*, 750 F.2d at 76.

As described above, the refusal even to consider addressing the Petition is entirely within the control of the Chairman. His public statements ("How about no") make plain that the Commission will not act on the Petition absent intervention from this Court. *See supra* at 15–18. And, in any event, he continues to invoke the news distortion policy to chill the First Amendment protected expression of Petitioners and regulated entities beyond them. Just last month, Chairman Carr invoked the news distortion policy to threaten broadcast licensees for the content of their coverage of the war in Iran. *See supra* at 11–12. These ongoing First Amendment harms constitute irreparable injury and warrant speedy action here. *See Elrod*, 427 U.S. at 373.

## CONCLUSION

For these reasons, the Court should grant Petitioners' request for a writ of mandamus and order the Commission to take action on the News Distortion Petition within 90 days of the Court's decision. The Court should also retain jurisdiction over the matter to ensure the Commission's compliance with its order.

April 28, 2026

Respectfully submitted,

/s/*Conor S. Gaffney*
Rachel Goodman
Janine M. Lopez
Tobin Raju
Conor S. Gaffney
**Protect Democracy Project**
2020 Pennsylvania Avenue NW
Suite 163
Washington DC 20006
(202) 579-4582

Andrew Jay Schwartzman
**Andrew Jay Schwartzman, PLLC**
525 9th Street NW, Seventh Floor
Washington, DC, 20004

Gigi Sohn
**G Squared Strategies**
3503 Alton Place, NW
Washington, DC 20008

Berin Szóka
**TechFreedom**
1500 K Street NW, Floor 2
Washington DC, 20005

# CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and D.C. Circuit Rule 32(e) because it contains 7,270 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(a)(1).

2. This brief complies with Federal Rule of Appellate Procedure 32(a)(5)'s typeface requirements and Federal Rule of Appellate Procedure 32(a)(6)'s typestyle requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Times New Roman font.

April 28, 2026

/s/ *Conor S. Gaffney*
Conor S. Gaffney

**CERTIFICATE OF SERVICE**

I certify that, on April 28, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. Consistent with 47 C.F.R. § 1.13(b), I also served a true copy of the foregoing upon the Commission's general counsel by email to LitigationNotice@fcc.gov. Consistent with 47 U.S.C. § 402(d), I will provide a courtesy copy of the foregoing to all other parties listed in section A of the certificate as to parties, rulings, and related cases appended to the front of this filing.

April 28, 2026

/s/*Conor S. Gaffney*
Conor S. Gaffney