No. 26-1099

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA**

———————

In re Radio Television Digital News Association, Rachelle B. Chong, Ervin S. Duggan, Mark S. Fowler, Alfred C. Sikes, Thomas E. Wheeler, Christopher J. Wright, Kathryn C. Brown, Jerald N. Fritz, *Petitioners*.

———————

**ADDENDUM TO PETITION FOR WRIT OF MANDAMUS
TO THE FEDERAL COMMUNICATIONS COMMISSION**

———————

Rachel Goodman
Janine M. Lopez
Tobin Raju
Conor S. Gaffney
**Protect Democracy Project**
2020 Pennsylvania Avenue NW
Suite 163
Washington DC 20006
(202) 579-4582

Andrew Jay Schwartzman
**Andrew Jay Schwartzman, PLLC**
525 9th Street NW, Seventh Floor
Washington, DC, 20004

Gigi Sohn
**G Squared Strategies**
3503 Alton Place, NW
Washington, DC 20008

Berin Szóka
**TechFreedom**
1500 K Street NW, Floor 2
Washington DC, 20005

*Counsel for Petitioners*

---

# TABLE OF CONTENTS

News Distortion Petition ................................................................................. Add. 1

RTDNA Notice of Joinder ........................................................................... Add. 20

Declaration of Ruth Milkman ..................................................................... Add. 23

Declaration of Caitlin Childs........................................................................ Add. 27

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

In the Matter of                                              )
                                                                    )
Repeal of the News Distortion Policy              )

<u>**PETITION FOR SPECIAL RELIEF**</u>

**Andrew C. Barrett, Rachelle B. Chong, Ervin S. Duggan, Mark S. Fowler, Dennis R. Patrick, Alfred C. Sikes, Thomas E. Wheeler, Christopher J. Wright, Kathryn C. Brown, Jerald N. Fritz, Peter Pitsch,**

*Petitioners*

**Protect Democracy Project**
Conor S. Gaffney
201 St. Charles Avenue, Suite 114
New Orleans, LA 70170
conor.gaffney@protectdemocracy.org
(202) 579-4582

Rachel E. Goodman
82 Nassau Street, # 601
New York, NY 10038
rachel.goodman@protectdemocracy.org
(202) 579-4582

**TechFreedom**
Berin Szóka
1500 K Street NW, Floor 2
Washington DC, 20005
bszoka@techfreedom.org

**G Squared Strategies, LLC**
Gigi Sohn
3503 Alton Place, NW
Washington, DC 20008
gbsohn@gmail.com

**Andrew Jay Schwartzman, PLLC**
Andrew Jay Schwartzman
525 9th Street NW, Seventh Floor
Washington, DC, 20004
andyschwartzman@gmail.com

*Counsel for Petitioners*

November 13, 2025

**Add. 1**

**SUMMARY**

The petitioners request that the FCC repeal the news distortion policy in full. In *Moody v. NetChoice, LLC*, the Supreme Court, applying the First Amendment, reaffirmed that the government has no role in "un-biasing" the media. In direct contradiction to that decision, the news distortion policy seeks to mold the speech of private broadcasters to the FCC's own view of what is correct, complete, and accurate news. The First Amendment forbids the government from embarking on such a project.

Furthermore, the application of the news distortion policy is constitutionally problematic. The vast scope and vague language of the news distortion policy cast an omnipresent shadow over broadcasters' freedom of expression while leaving the policy open to partisan weaponization. Wielding the news distortion policy, the FCC has already opened or threatened to open investigations against private broadcasters due to disagreements with editorial decisions or statements made in a comedic monologue. Even if the FCC never tries to take enforcement action in these cases, the specter of government interference alone chills broadcasters' speech and suppresses their message.

Because the FCC has no legitimate interest in correcting or punishing what it considers to be slanted news coverage, the news distortion policy lacks a meaningful function. Over a period of 60 years, the FCC only enforced the policy eight times, typically in cases involving an intentional hoax. However, such cases are now covered by the FCC's broadcast hoax role, rendering the news distortion policy a vestigial organ. In light of its redundancy and obsolescence, as well as its actively harmful effects, amply demonstrated as of late, the petitioners respectfully request the repeal of the news distortion policy.

i

**Add. 2**

## TABLE OF CONTENTS

I.      Introduction...................................................................................... 1

II.     Background on the News Distortion Policy .................................... 2

III.    Interests of Petitioners ................................................................... 5

IV.     Reasons for Repealing the News Distortion Policy ........................ 6

        A.      The news distortion policy's purpose—to eliminate bias in the news—is not a
                legitimate government interest ............................................... 6

        B.      The policy has chilled broadcasters' speech ........................ 8

        C.      The policy has been weaponized for partisan purposes ................. 10

        D.      The policy is overly vague ................................................. 12

        E.      The policy is unnecessary, particularly in light of the rule against broadcast
                hoaxes ............................................................................. 13

V.      Conclusion ................................................................................... 15

ii

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

In the Matter of )

Repeal of the News Distortion Policy )

**PETITION FOR SPECIAL RELIEF**

**To:    The Commission[1]**

## I.    Introduction

The Supreme Court has "many times held, in many contexts, that it is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences."[2] Nor does government have any "power to restrict expression because of its message, its ideas, its subject matter, or its content."[3] Even false speech is protected by the First Amendment.[4] The Communications Act similarly denies "the Commission the power of censorship" or the ability to

---

[1] Because the relief requested requires repealing and revising established Commission policy and precedent, this petition must be decided by the full Commission. Section 0.283(c) of the Commission's rules stipulates that the Chief of the Media Bureau "shall … refer[] to the Commission en banc for disposition … [m]atters that present novel questions of law, fact or policy that cannot be resolved under existing precedents and guidelines." *See also* Section 0.5(c) ("[T]he Commission has delegated authority to its staff to act on matters which are minor or routine or settled in nature.").

[2] *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024).

[3] *United States v. Alvarez*, 567 U.S. 709, 716 (2012) (plurality opinion).

[4] *Id*.

**Add. 4**

"interfere with the right of free speech."[5] Yet the current FCC Chairman has asserted the power to do precisely what the Supreme Court and Congress have forbidden, and what former FCC general counsel declared the agency could not do: "act as a self-appointed, free-roving arbiter of truth in journalism."[6]

To achieve this, Chairman Carr has invoked the news distortion policy and the public interest obligations of broadcasters. We ask the Commission to rescind the news distortion policy and affirm that the agency cannot police broadcaster licensees' speech for bias or the falsity of the speech they carry, except under the exceedingly narrow circumstances of the broadcast hoax rule.

## II.     Background on the News Distortion Policy

In 1949, the Commission declared that, by requiring broadcast licensees to operate in the "public interest, convenience and necessity," Congress implicitly forbade any licensee to "exercise his authority over the selection of program material to distort or suppress the basic factual information upon which any truly fair and free discussion of public issues must necessarily depend."[7] This policy was a corollary of the now-defunct fairness doctrine, motivated by the Commission's sense that broadcasters must "maintain" the public airwaves as a source of "reasonably balanced" discussions of news.[8] While the fairness doctrine explicitly involved balancing certain broadcast media coverage, the news distortion policy did the same implicitly. Both concepts required the Commission to assess the objectivity of news.

---

[5] 47 U.S.C. § 326.

[6] *Letter to Jessica J. Gonzalez*, 35 FCC Rcd. 3032, 3033 (MB & OGC 2020).

[7] *See Report on Editorializing by Broadcast Licensees*, 13 F.C.C. 1246, 1254 (1949).

[8] *Id.* at 1257–58.

2

Add. 5

The policy remained largely dormant until the late 1960s and 1970s, when several high-profile allegations of news staging and falsification drew the attention of Congress and the public.[9] In this period, the Commission articulated the contemporary policy, which imposes a high threshold for even considering news distortion complaints. First, there must be "deliberate distortion," as distinct from "mere inaccuracy or difference of opinion."[10] Second, there must be extrinsic evidence (i.e., beyond the broadcast itself) demonstrating that the broadcaster deliberately distorted or staged the news.[11] Third, the distortion must apply to a "significant event," rather than minor inaccuracies or incidental aspects of the report.[12] And finally, extrinsic evidence must show that the distortion involved the "principals, top management, or news management" of the licensee, as opposed to other employees.[13]

These procedural safeguards around the use of the news distortion policy reflect the Commission's recognition that embroiling the government in reviewing the accuracy of news broadcasts presents grave risks to a free press and free expression. The agency has recognized that journalism "necessarily involves selection and editorial judgment,"[14] that any government efforts to "authenticate the news" would "cast the chill of omnipresent government censorship over the newsmen's independence,"[15] and that it would be "unwise and probably impossible" for a

---

[9] Lili Levi, *Reporting the Official Truth: The Revival of the FCC's News Distortion Policy*, 78 Wash. U. L. Q. 1005, 1016–17 (2000).

[10] *Galloway v. FCC*, 778 F.2d 16, 20 (D.C. Cir. 1985).

[11] *See Hunger in Am.*, 20 F.C.C.2d 143, 150–51 (1969).

[12] *Galloway*, 778 F.2d at 20.

[13] *Hunger in Am.*, 20 F.C.C.2d at 150.

[14] *The Selling of the Pentagon*, 30 F.C.C.2d 150, 152 (1971).

[15] *Mrs. J.R. Paul*, 26 F.C.C.2d 591, 592 (1969).

Add. 6

government agency to judge the "accuracy" of broadcasts.[16] That would require the Commission to "sit as a review body of the 'truth' concerning news events"—a subjective role that is plainly "not appropriate" for a government licensing agency.[17] The Commission thus repeatedly stated that it "cannot properly investigate . . . whether an account or analysis of a news commentator is 'biased' or 'true.'"[18]

Despite these concerns, the Commission retained its news distortion policy because it considered broadcasting critical to ensuring "an informed public."[19] But while the safeguards the Commission erected around the news distortion policy ensured its sparing and judicious use for several decades,[20] the policy's existence has left the door open for the Commission to do exactly what the Supreme Court has said the First Amendment prohibits: police media "bias."

This possibility has become reality lately. The current leadership of the Commission is using the news distortion policy to directly advance the interests of the White House. As discussed in greater detail below, the Commission has reopened and threatened to open news distortion investigations into broadcasters simply because the Chairman disapproves of their coverage as biased or allegedly "false." This pattern of escalating attacks demonstrates just how sweeping and dangerous the expansive powers claimed under the news distortion policy are.

---

[16] *The Selling of the Pentagon*, 30 F.C.C.2d at 152.

[17] *Network Coverage of the Democratic Nat'l Convention*, 16 F.C.C.2d 650, 655 (1969).

[18] *Mrs. J.R. Paul*, 26 F.C.C.2d at 592.

[19] *Selling of the Pentagon*, 30 F.C.C.2d at 153; Levi, *supra* note 9, at 1099–1100.

[20] The Commission issued findings of liability in just eight cases between 1969 and 2019—including only one between 1985 and 2019. Joel Timmer, *Potential FCC Actions Against "Fake News": The News Distortion Policy and the Broadcast Hoax Rule*, 24 Commc'n L. & Pol'y 1, 20 (2019); Chad Raphael, *The FCC's Broadcast News Distortion Rules: Regulation by Drooping Eyelid*, 6 Commc'n L. & Pol'y 485, 501 (2001).

**Add. 7**

### III.    Interests of Petitioners

Petitioners include seven former commissioners and chairs of the Federal Communications Commission and other former Commission senior leadership. Throughout their service, these petitioners balanced pursuing the agency's regulatory mandate with the limitations of the Constitution and the Communications Act.

**Andrew C. Barrett** served as a Republican commissioner on the Federal Communications Commission from 1989 to 1996. He was appointed by President George H.W. Bush.

**Rachelle B. Chong** served as a Republican commissioner on the Federal Communications Commission from 1994 to 1997. She was appointed by President Bill Clinton.

**Ervin S. Duggan** served as a Democratic commissioner on the Federal Communications Commission from 1990 to 1994. He was appointed by President George H.W. Bush.

**Mark S. Fowler** served as a Republican commissioner and chairman of the Federal Communications Commission from 1981 to 1987. He was appointed by President Ronald Reagan.

**Dennis R. Patrick** served as Republican commissioner and chairman of the Federal Communications Commission from 1987 to 1989. He was appointed by President Ronald Reagan.

**Alfred C. Sikes** served as a Republican commissioner and chairman of the Federal Communications Commission from 1989 to 1993. He was appointed by President George H.W. Bush.

**Thomas E. Wheeler** served as a Democratic commissioner and chairman of the Federal Communications Commission from 2013 to 2017. He was appointed by President Barack Obama.

**Christopher J. Wright** served as general counsel of the Federal Communications Commission from 1997 to 2001.

**Kathryn C. Brown** served as chief of staff to Chairman William E. Kennard from 1998 until 2001.

**Jerald N. Fritz** served as legal advisor and chief of staff to Chairman Mark Fowler from 1981 to 1987.

**Peter Pitsch** served as chief of staff to Chairman Dennis Patrick from 1987 to 1989, and as Chief of Office of Plans and Policy at the Federal Communications Commission from 1981 to 1987.

## IV.     Reasons for Repealing the News Distortion Policy

This petition presents five independent reasons for repealing the news distortion policy in full. *First*, despite the Commission's efforts to narrow the policy and prevent abuse, it remains inherently dangerous; it necessarily embroils the government in trying to police media bias, which the Supreme Court has emphatically rejected as a legitimate government interest. *Second*, the news distortion policy has significantly chilled and otherwise altered the content of broadcasters' speech, undermining First Amendment values. *Third*, the news distortion policy has recently shown itself to be vulnerable to partisan weaponization, as recent investigations and public statements of the Chairman have demonstrated. *Fourth*, the news distortion policy remains overly vague, exacerbating its chilling effects and leading to confusion for broadcasters and the public at large. And *finally*, the Commission's narrowly tailored rule against broadcasting hoaxes adequately serves any remaining justifiable interest the agency has in the news distortion policy. The policy should be abandoned in full.

### A.     The news distortion policy's purpose—to eliminate bias in the news—is not a legitimate government interest.

Since the 1960s, courts have become increasingly clear that the First Amendment bars government efforts to "balance" the marketplace of ideas. Last Term, the Supreme Court

decisively rejected government efforts "to decide what counts as the right balance of private expression—to 'un-bias' what it thinks is biased."[21] Making clear that the point applied to all media, the Court added: "On the spectrum of dangers to free expression, there are few greater than allowing the government to change the speech of private actors in order to achieve its own conception of speech nirvana."[22] The Court said nothing to suggest that this danger was any less great regarding broadcasters.[23]

This principle applies just as readily to broadcast news coverage as it does to other types of speech. The *Moody* Court relied heavily on *Miami Herald Company v. Tornillo*, which held that a newspaper's content decisions—"whether fair or unfair"—amounted to a protected exercise of "editorial control and judgment."[24] Therefore, the government could not compel newspapers to offer so-called balanced coverage of a particular issue by requiring papers to provide space for candidates who had been criticized to respond.[25] Justice White, concurring in *Miami Herald*, warned that any system that "would supplant private control of the press with the heavy hand of government intrusion" would "make the government the censor of what the people may read and know."[26] The Commission similarly applied these principles in its decision ending the fairness doctrine. The agency expressly "repudiated the notion that it was proper for a governmental authority to intervene actively in the marketplace of ideas," particularly since enforcement of the

---

[21] *Moody*, 603 U.S. at 719.

[22] *Id.* at 741–42.

[23] *See id.* at 742 n.10 (distinguishing cases upholding FCC content regulation authority as not involving exercises of that authority to "balance" or alter expressive content).

[24] *Miami Herald Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

[25] *Id.*

[26] *Id.* at 260 (White, J., concurring).

**Add. 10**

doctrine required the Commission to "make subjective and vague value judgments" about "the manner and balance of coverage."[27]

These developments directly undermine the Commission's asserted interest in maintaining any news distortion policy. This policy, too, requires the Commission to assess whether an outlet's coverage is "slanted." News outlets that depart from the Government's official narrative will be systematically driven from the marketplace in an effort to "un-bias" the news—exactly what the First Amendment forbids.[28] "The First Amendment," then-Judge Kavanaugh proclaimed, "protects an independent media and an independent communications marketplace against takeover efforts by the Legislative and Executive Branches."[29]

### B.     The policy has chilled broadcasters' speech.

The Supreme Court has also recognized that "serious" First Amendment issues would arise if the Commission's policies had a chilling effect on broadcasters' speech and reduced their willingness to cover controversial issues.[30] In the 1980s, the Commission concluded that the fairness doctrine had that effect. Importantly, the Commission found that this alleged self-censorship took place even though it rarely enforced the doctrine, extended significant deference to broadcasters' editorial judgments, and imposed strong threshold limitations on the doctrine in an effort to cabin its scope.[31]

---

[27] *Syracuse Peace Council*, 2 F.C.C. Rcd. 5043, 5051 (1987).

[28] *Moody*, 603 U.S. at 719.

[29] *U.S. Telecom. Ass'n v. FCC*, 855 F.3d 381, 427 (D.C. Cir. 2017) (Kavanaugh, J., dissenting from denial of rehearing en banc). *See also* Levi, *supra* note 9, at 1110 (stating that a critical premise of our constitutional structure is that "a press independent from government will more likely enhance democratic discourse").

[30] *See Red Lion Broadcasting Co., Inc. v. FCC*, 395 U.S. 367, 393 (1969).

[31] *Syracuse Peace Council*, 2 F.C.C. Rcd. at 5049–50.

The news distortion policy similarly chills broadcasters' speech. As the National Association of Broadcasters has explained, the news distortion policy "incentivize[s] stations to avoid controversial and partisan issues and present only 'bland, inoffensive' material, contrary to the public interest."[32] During the first Trump Administration, Chairman Ajit Pai echoed these concerns in rejecting a request to investigate a broadcaster over news distortion allegations: "I can hardly think of an action more chilling of free speech than the federal government investigating a broadcast station because of disagreement with its news coverage or promotion of that coverage."[33] Commissioner Anna Gomez recently indicated that these concerns are not just theoretical, as she has "heard from broadcasters who are telling their reporters to be careful about the way the[y] cover this administration."[34] High-profile departures from CBS—the target of an ongoing news distortion investigation—confirm this as well. The longtime executive producer of "60 Minutes" resigned in April 2025, writing that he was no longer able "[t]o make independent decisions based on what was right for 60 Minutes, right for the audience."[35]

The vast scope of the news distortion policy underlies the dangers it creates. Unlike the fairness doctrine, which applied only to coverage of "controversial issues of public importance," the news distortion policy applies broadly to coverage of *any* news event. Every news segment is open to scrutiny to determine whether the broadcaster presented the "essential facts of the news

---

[32] Comments of the National Association of Broadcasters, Docket 25-73 (March 7, 2025) at 13, https://www.fcc.gov/ecfs/document/10307109522139/1.

[33] Letter from Ajit V. Pai, Chairman, FCC, to the Honorable Maria Cantwell, Senator, United States Senate (April 12, 2018), https://docs.fcc.gov/public/attachments/DOC-350372A1.pdf.

[34] Oliver Darcy, *Alone at the FCC*, Status (July 13, 2025), https://www.status.news/p/fcc-commissioner-anna -gomez-free-speech.

[35] Niha Masih & Sarah Ellison, *'60 Minutes' Producer Bill Owens Resigns*, Wash. Post (Apr. 23, 2025), https://www.washingtonpost.com/style/2025/04/23/60-minutes-producer-bill-owens-resigns.

**Add. 12**

stories … in an accurate manner."[36] Thus, every allegation of news distortion requires the Commission to assess for itself what "accurate" coverage of the news event in question would look like and to measure the broadcaster's coverage against that determination.[37] It jeopardizes whatever news is being covered. False reporting of a high school lunch menu would be just as much of a violation as showing fake crowd footage to imply that a political rally drew a large crowd. That means broadcasters cannot minimize their liability just by avoiding controversial issues. Instead, broadcasters are more likely to meaningfully alter their news coverage in ways that align with the current administration's preferred narratives.

### C.    The policy has been weaponized for partisan purposes.

A third reason for repealing the news distortion policy is its dangerous potential for partisan abuse. Since the dawn of broadcast regulation, Congress has designed regulatory authority so that it "should be as free from political influence or arbitrary control as possible."[38] But content regulation authorities like the news distortion policy can easily be weaponized for partisan purposes.

The current Commission's conduct illustrates this danger. In January 2025, under the prior administration, Commission staff dismissed a news distortion complaint concerning CBS's editing of an election-season interview with then-presidential candidate Kamala Harris. The interview aired on two separate CBS programs, "Face the Nation" and "60 Minutes." Both broadcasts aired footage of the same question, and each program aired different portions of the response. The complaint, filed by the Center for American Rights, alleged that CBS's conduct amounted to

---

[36] *Galloway*, 778 F.2d at 20.

[37] Levi, *supra* note 9, at 1111.

[38] S. Rep. No. 69-772, at 2 (1926), https://www.govinfo.gov/content/pkg/SERIALSET-08526_00_00-038-0772-0000/pdf/SERIALSET-08526_00_00-038-0772-0000.pdf.

actionable news distortion. Applying well-settled agency precedent, the Commission dismissed the complaint and made clear that any other disposition would violate the First Amendment and Communications Act's prohibition on censorship.[39] The Commission likewise dismissed a complaint alleging news distortion by ABC in connection with the moderation of a presidential debate.[40] And the staff dismissed a petition to deny the license renewal of a Fox affiliate based in part on allegations that it condoned news distortion of a commonly owned cable channel that disseminated statements about the 2020 election even after a court found them to be false.[41] Just days after assuming office, Chairman Brendan Carr—with no explanation—reopened the news distortion complaints against broadcasters that had allegedly harmed President Trump's interests while leaving undisturbed the dismissal of the Fox petition alleging distortion in Trump's favor.[42]

This pattern has continued throughout the first several months of the second Trump administration. Chairman Carr appeared to threaten a news distortion investigation into other outlets perceived to be antagonistic to Trump, solely because they described Kilmar Ábrego Garcia, the individual at the center of a wrongful-deportation scandal, as a "Maryland man."[43] Chairman Carr publicly described the coverage by "Comcast outlets" as "news distortion,"

---

[39] Letter to Daniel R. Suhr (WCBS), (January 16, 2025), https://docs.fcc.gov/public/attachments/DOC-408899A1.pdf.

[40] Letter to Daniel R. Suhr (WPVI), (January 16, 2025), https://docs.fcc.gov/public/attachments/DOC-408880A1.pdf.

[41] Application of Fox Television Stations, LLC For Renewal of License of WTXF-TV, 40 FCC Rcd. 438, 444 and nn. 48-49 (2025).

[42] Public Notice, *FCC Establishes MB Docket No. 25-73 and Comment Cycle for News Distortion Complaint Involving CBS Broadcasting Inc., Licensee of WCBS, New York, NY*, 40 F.C.C. Rcd. 1132 (2025).

[43] Brendan Carr (@BrendanCarrFCC), X (Apr. 16, 2025, 6:58 PM), https://x.com/BrendanCarrFCC/status /1912641900558893377.

Add. 14

suggesting they were not complying with their obligation to operate in the public interest.[44] The Center for American Rights promptly filed a formal news distortion complaint with the Commission, criticizing the outlets' "extreme and evident bias."[45] This example illustrates the extraordinary intrusions on editorial decisionmaking that Chairman Carr apparently understands the news distortion policy to permit. Purporting to apply the policy, Chairman Carr has used the power of the FCC to question the precise words an outlet uses to describe an individual, as well as the outlet's decisions about which facts are relevant enough to include in any particular story. And most recently, Chairman Carr threatened ABC with allegations of news distortion over late-night host Jimmy Kimmel's jokes about the motives of Charlie Kirk's alleged killer. "We can do this the easy way or the hard way," Chairman Carr said.[46] Hours later, ABC suspended Kimmel indefinitely.

### D.    The policy is overly vague.

A fourth reason for repealing the news distortion policy is the inherent vagueness of the policy. Violations of the policy could place a broadcaster's very license at risk, yet the basic contours of the policy remain entirely unclear. As the National Association of Broadcasters has pointed out, the Commission's news distortion decisions do not even offer a "clear definition of

---

[44] *Id.*

[45] George Winslow, *Group Files FCC Complaint Against ABC, NBC and CBS for "News Distortion,"* TV Tech (Apr. 22, 2025), https://www.tvtechnology.com/news/group-files-fcc-complaint-against-abc-nbc-and-cbs-for-news -distortion.

[46] David Folkenflik, *Jimmy Kimmel's Suspension Shows Power of FCC's Brendan Carr*, NPR (Sept. 19, 2025), https://www.npr.org/2025/09/19/nx-s1-5546764/fcc-brendan-carr-kimmel-trump-free-speech.

what programming constitutes 'news'" and can therefore be challenged as allegedly distorted or slanted.[47]

As it developed the fairness doctrine, the Commission sought to clarify the scope of broadcasters' obligations in adjudications and reports.[48] The Commission concluded that the doctrine failed to provide adequate notice to broadcasters.[49] This is even more true of the news distortion policy, where the Commission has made no comparable efforts at clarity. Even if it were to adopt specific and clear standards for news distortion, the policy would remain hopelessly vague. While the Commission's enforcement actions have repeatedly emphasized the policy's exceedingly narrow scope, Chairman Carr's recent decision to reopen complaints that cannot plausibly satisfy the precedents previously articulated in adjudications leaves greater confusion than ever about what exactly the policy proscribes.

### E.  The policy is unnecessary, particularly in light of the rule against broadcast hoaxes.

Finally, the fact that the news distortion policy provides so little benefit to the public is a persuasive reason to discard it, particularly when weighed against the enormous costs described above. As explained, the Commission repeatedly expressed grave concerns about intruding on the editorial judgment of broadcasters, and it purported to adopt a strict standard for news distortion to ensure the policy did not result in "omnipresent government censorship."[50] Because of that high standard, the Commission found broadcasters liable for news distortion in just *eight* cases between

---

[47] Comments of National Association of Broadcasters, *supra* note 32, at 18.

[48] *Syracuse Peace Council*, 2 F.C.C. Rcd. at 5046–47.

[49] *Id.* at 5043.

[50] *Mrs. J.R. Paul*, 26 F.C.C.2d at 592.

**Add. 16**

1969 and 2019.[51] That record at least calls into question whether the policy actually serves the public interest in any meaningful way.

Moreover, the cases in which the Commission did enforce the news distortion policy typically involved the "staging" or outright fabrication of news events (e.g., kidnappings), rather than alleged slanting or bias in the presentation of news.[52] In 1992, the Commission specifically adopted a rule that will often apply in this type of situation.[53] The rule prohibits broadcasters from "broadcasting false information concerning a crime or a catastrophe" if (1) the licensee knows this information is false, (2) it is foreseeable that broadcast of the information will cause substantial public harm, and (3) broadcast of the information does in fact directly cause substantial public harm.[54] All three prongs of the rule must be satisfied for a broadcaster to be subject to liability.

At the time of its adoption, the Commission acknowledged that the rule applies to only a narrow subset of the conduct covered by the news distortion policy: only clear, intentional falsity regarding public safety, not bias or a lack of "balance." The rule gave the agency greater "enforcement flexibility" with respect to that misconduct—i.e., the ability to impose fines in addition to issuing letters of admonition.[55] But the Commission chose not to make the rule apply broadly to all "news distortion." Instead, the Commission explained that it had carefully crafted the rule against hoaxes to survive strict scrutiny and thus avoid "an undue chilling effect on

---

[51] *See* Raphael *supra* note 20 at 486.

[52] *See* Raphael, *supra* note 20, at 502; *Walton Broadcasting, Inc. (KIKX)*, 78 F.C.C.2d 880, 955–68 (1976).

[53] *See* Amendment of Part 73 Regarding Broadcasting Hoaxes, 7 F.C.C. Rcd. 4106 (1992).

[54] 47 C.F.R. § 73.1217.

[55] Amendment of Part 73 Regarding Broadcast Hoaxes, 7 F.C.C. Rcd. 4106, at *1.

broadcast speech."[56] The hoax rule covers the type of deliberate misconduct that the government can properly regulate, without entangling the Commission in reviewing the editorial decisions that news outlets routinely make in deciding how to present the news. In effect, "the Commission has applied this [hoax] rule narrowly in light of the substantial First Amendment concerns involved with the federal government policing the content of broadcast news."[57]

As explained, the First Amendment bars the Commission from punishing news outlets for providing what the agency considers "slanted" coverage. Thus, the only legitimate interest underlying the news distortion policy is the interest in ensuring that broadcasters do not deliberately fabricate news stories about matters of public safety. That interest is adequately served by the Commission's rule against broadcasting hoaxes.

## V.    Conclusion

We respectfully request the Commission repeal the news distortion policy not only because it fails to serve the public interest, but also because it disserves the public in many ways. The news distortion policy is no longer justifiable under today's First Amendment doctrine and no longer necessary in today's media environment. Freedom of speech is the linchpin of technological innovation and progress. It encourages greater distribution and consideration of new ideas. In a culture of free speech, more ideas are considered by more people, producing a hypergolic effect on scientific progress—one of the major forces that keeps the free world free. The Commission should repeal the policy in full and recognize that it may not investigate or penalize broadcasters for "distorting," "slanting," or "staging" the news, unless the broadcast at issue independently meets the high standard for broadcasting a dangerous hoax under 47 C.F.R. § 73.1217.

---

[56] *Id.* at 3.

[57] Letter to Jessica J. Gonzalez, *supra* note 6, at 3033.

**Add. 18**

Respectfully submitted,

*/s/ Conor S. Gaffney*
**Protect Democracy Project**
Conor S. Gaffney

201 St. Charles Avenue, Suite 114
New Orleans, LA 70170
conor.gaffney@protectdemocracy.org
(202) 579-4582

Rachel E. Goodman
82 Nassau Street, #601
New York, NY 10038
rachel.goodman@protectdemocracy.org
(202) 579-4582

**TechFreedom**
Berin Szóka
1500 K Street NW, Floor 2
Washington DC, 20005
bszoka@techfreedom.org

**G Squared Strategies, LLC**
Gigi Sohn
3503 Alton Place, NW
Washington, DC 20008
gbsohn@gmail.com

**Andrew Jay Schwartzman, PLLC**
Andrew Jay Schwartzman
525 9th Street NW, Seventh Floor
Washington, DC, 20004
andyschwartzman@gmail.com

*Counsel for Petitioners*

November 13, 2025

16

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | Undocketed (filed November 13, 2025) |
| Repeal of the News Distortion Policy | ) | |

**To:    The Commission**

## <u>NOTICE OF JOINDER</u>

The Radio Television Digital News Association (RTDNA) writes to express its support for, and join in, the November 13, 2026 *Petition for Special Relief* (Petition) filed by Andrew C. Barrett, Rachelle B. Chong, Ervin S. Duggan, Mark S. Fowler, Dennis R. Patrick, Alfred C. Sikes, Thomas E. Wheeler, Christopher J. Wright, Kathryn C. Brown, Jerald N. Fritz, and Peter Pitsch seeking the repeal of the Commission's news distortion policy. Although the Petition was submitted to the full Commission on November 13, 2025, it has yet to be assigned a docket number.

RTDNA is the world's largest professional organization dedicated only to broadcast and digital journalism. RTDNA has over 1,200 members. Our individual members include broadcast journalists, news staff, news directors, and news managers, and our corporate members are broadcasters, large and small, that collectively hold hundreds of radio and television broadcast licenses issued by the Commission. Across the board, RTDNA's members are dedicated to serving the public interest through excellence in journalism and providing accurate, truthful information to the benefit of their local communities.

RTDNA members participate in all phases of the production of the news, and are subject to the Commission's news distortion policy. They therefore have a direct interest in the repeal of

1

**Add. 20**

the policy. Specifically, RTDNA's members have experienced a tangible chilling effect given the FCC's pronouncements about current application of the news distortion policy. As part of their obligation to keep the public informed, broadcast newsrooms exercise editorial discretion and make ethical judgments at every step of the journalistic process, including story selection, newsgathering, production, presentation and delivery. Moreover, in broadcast journalism, editing in accordance with the unique needs of the platform is key to developing a final product from elements provided by news reporters and producers: narration track, soundbites, video, graphics, b-roll, and more. Fear of the FCC second-guessing their routine decision making has our members looking over their shoulders. RTDNA members have modified coverage, reassigned reporters, modified hiring decisions, adjusted coverage plans, and been subjected to increased editorial oversight. This compromises their ability to perform their jobs responsibly and threatens journalistic independence. Absent journalistic independence, corruption and misinformation flourish.

For the reasons discussed more fully in the petition, the Commission should immediately repeal its news distortion policy. RTNDA's members face continuing injury to their First Amendment rights due to the news distortion policy. The ongoing pattern of threats from the Commission and the Chair to abuse the policy continues to chill RTDNA's members. As discussed in the Petition, the news distortion policy is impermissible under contemporary First Amendment law. It has been weaponized for partisan political purposes. It is overly vague. And it serves no critical regulatory purpose, as evidenced by the Commission's sparing use of the policy until January 2025.

For these reasons, more fully discussed in the Petition, the Commission should immediately repeal the news distortion policy.

2

**Add. 21**

Respectfully submitted,

_/s/ Tara Puckey_
Tara Puckey
President and CEO
**Radio Television Digital News Association**
529 14th St. NW, Ste. 1240
Washington, DC 20045

April 20, 2026

**Add. 22**

No. 26-____

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

_____

In re Radio Television Digital News Association, Rachelle B. Chong, Ervin S. Duggan, Mark S. Fowler, Alfred C. Sikes, Thomas E. Wheeler, Christopher J. Wright, Kathryn C. Brown, Jerald N. Fritz, *Petitioners*.

_____

# DECLARATION OF RUTH MILKMAN

_____

Rachel Goodman
Janine M. Lopez
Tobin Raju
Conor S. Gaffney
**Protect Democracy Project**
2020 Pennsylvania Avenue NW
Suite 163
Washington DC 20006
(202) 579-4582

Andrew Jay Schwartzman
**Andrew Jay Schwartzman, PLLC**
525 9th Street NW, Seventh Floor
Washington, DC, 20004

Gigi Sohn
**G Squared Strategies**
3503 Alton Place, NW
Washington, DC 20008

Berin Szóka
**TechFreedom**
1500 K Street NW, Floor 2
Washington DC, 20005

*Counsel for Petitioners*

I, Ruth Milkman, declare as follows:

1.  I was the Chief of Staff of the Federal Communications Commission (FCC) from November 2013 until January 2017. In that capacity, I reported directly to the Chairman of the FCC, and all of the Bureau and Office Chiefs reported to me. Under the direction of the Chairman (then Chairman Tom Wheeler), I oversaw the policy and licensing work of the FCC Bureaus, including the allocation of resources and the development of draft decisions for Commission consideration, in furtherance of the Chairman's agenda. Prior to my role as Chief of Staff, I had been the Chief of the Wireless Telecommunications Bureau and Special Counsel to the previous Chairman, Julius Genachowski, from June 2009 to November 2013. In a prior stint at the Commission, from 1986 to 1998, I served in various roles, including Senior Legal Advisor to Chairman Reed Hundt, as well as Deputy Bureau Chief in the Common Carrier and International Bureaus.[1]

2.  I retired on December 31, 2025, after 40 years of work on telecommunications law and policy. From 2017 until my retirement, I was a partner in Quadra Partners, LLC, a strategic advisory firm that serves clients in the converging communications technology industries. From 1998 to 2009, I was a co-founding partner of Lawler, Metzger, Milkman and Keeney, a telecommunications law firm. I received a B.A. from Harvard University and a J.D. from the University of Michigan Law School. I served as a clerk for the Honorable J. Harvie Wilkinson III on the U.S. Court of Appeals for the Fourth Circuit.

3.  In this declaration, I explain that under the statute and as a matter of longstanding practice under both Democratic and Republican administrations, the Chairman of the FCC controls the agenda. The Commissioners do not vote on anything unless the vote has been authorized

---

[1] There have been periodic reorganizations at the FCC, and those bureaus have been renamed. The Common Carrier Bureau was the predecessor of the Wireline Competition Bureau, and the International Bureau was the predecessor of the Space Bureau.

1

**Add. 24**

by the Chairman, and the Bureaus and Offices of the FCC undertake work at the direction of the Chairman.

4. Under 47 U.S.C. § 154(a), the FCC is "composed of five commissioners appointed by the President, by and with the advice and consent of the Senate, one of whom the President shall designate as chairman."

5. 47 U.S.C. § 155(a) provides in pertinent part that: "The member of the Commission designated by the President as chairman shall be the chief executive officer of the Commission. It shall be his duty to preside at all meetings and sessions of the Commission, . . . and generally to coordinate and organize the work of the Commission in such manner as to promote prompt and efficient disposition of all matters within the jurisdiction of the Commission."

6. The Commission's rules set forth procedures for administration of functions such as adjudication of complaints and license applications, and for rulemakings. When there is no specific provision governing a particular form of relief, parties may file petitions for special relief.

7. As a matter of law and in practice, as Chief Executive Officer, the FCC Chairman controls the agency's resources, including the direction of budgeted monies and staff. In furtherance of the Chairman's agenda, he directs the allocation of resources to his priorities, and also directs the policy outcomes. Thus, the Chairman determines whether and when matters are presented to the full Commission for action, be they appeals from Bureau decisions or matters brought directly to the full Commission. There is no mechanism either in the rules, or as a matter of longstanding practice, for other Commissioners to bring a matter to the full Commission for consideration, unless they have the agreement of the Chairman. The Chairman selects the office heads and bureau chiefs and controls the outcome of staff actions on delegated authority. Draft decisions are written under the supervision of the Chairman and are presented to the other Commissioners with a proposed outcome.

2

**Add. 25**

8.      I am familiar with the November 13, 2025 Petition for Special Relief filed by a group of former FCC Chairmen, Commissioners and Chiefs of Staff. Because the petition calls for overruling an agency policy that was adopted by the full Commission, the FCC staff cannot act on the petition under delegated authority. The Chairman has exclusive control over whether and when any decision granting or denying the Petition for Special Relief is presented to the full Commission for resolution.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day April 23, 2026 in Arlington, Virginia

Ruth Milkman

3

**Add. 26**

No. 26-____

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

In re Radio Television Digital News Association, Rachelle B. Chong, Ervin S. Duggan, Mark S. Fowler, Alfred C. Sikes, Thomas E. Wheeler, Christopher J. Wright, Kathryn C. Brown, Jerald N. Fritz, *Petitioners*.

## DECLARATION OF CAITLIN CHILDS

Rachel Goodman
Janine M. Lopez
Tobin Raju
Conor S. Gaffney
**Protect Democracy Project**
2020 Pennsylvania Avenue NW
Suite 163
Washington DC 20006
(202) 579-4582

Andrew Jay Schwartzman
**Andrew Jay Schwartzman, PLLC**
525 9th Street NW, Seventh Floor
Washington, DC, 20004

Gigi Sohn
**G Squared Strategies**
3503 Alton Place, NW
Washington, DC 20008

Berin Szóka
**TechFreedom**
1500 K Street NW, Floor 2
Washington DC, 20005

*Counsel for Petitioners*

**Add. 27**

I, Caitlin Childs, declare as follows:

1.  I am a paralegal and impact associate at the Protect Democracy Project, a non-profit organization representing the Petitioners in the above-captioned matter. I submit this declaration in support of Petitioners' Petition for a Writ of Mandamus to the Federal Communications Commission. The facts stated herein are based on my personal review of the following, true and correct copies of which are attached hereto.

2.  On January 22, 2025, Ted Johnson published an article in Deadline, titled *New FCC Chair Revives Complaints About ABC, CBS And NBC Content That His Predecessor Rejected As "At Odds With The First Amendment."* A true and correct copy is attached as Exhibit 1 and available at: https://perma.cc/L7NP-WM4Z.

3.  On April 16, 2025, Brendan Carr posted on X. A true and correct copy is attached as Exhibit 2 and available at: https://perma.cc/Z2VG-XUSR.

4.  On April 23, 2025, Niha Masig and Sarah Ellison published an article in The Washington Post, titled *60 Minutes' Producer Bill Owens Resigns, Citing Loss of Journalistic Freedom*. A true and correct copy is attached as Exhibit 3 and available at: https://perma.cc/8LLS-KJ3H.

1

**Add. 28**

5.    On August 4, 2025, Institute for Mergers, Acquisitions and Alliances published a blog post titled *M&A in the Spotlight: Skydance, Paramount and the Politics of Media Power*. A true and correct copy is attached as Exhibit 4 and available at: https://perma.cc/GT8T-UML9.

6.    On July 22, 2025, Stephanie Kyoko McKinnon, General Counsel and Co-President of Business Operations at Skydance Media, sent a letter to Chairman Brendan Carr, which was docketed in Media Bureau proceeding 24-275. A true and correct copy is attached as Exhibit 5 and available at: https://www.fcc.gov/ecfs/document/1072299913934/2.

7.    On July 24, 2026, the Office of Chairman Brendan Carr issued a press release titled *FCC Approves Skydance's Acquisition of Paramount CBS*. A true and correct copy is attached as Exhibit 6 and available at: https://docs.fcc.gov/public/attachments/DOC-413229A1.pdf.

8.    On March 14, 2026, Brendan Carr posted on X. A true and correct copy is attached as Exhibit 7 and available at: https://perma.cc/4E56-AAQH.

9.    On November 13, 2025, Brendan Carr posted on X in response to an NBC news article about the News Distortion Petition. A true and correct copy is attached as Exhibit 8 and available at: https://perma.cc/2Q79-MF7U.

2

10.  On November 14, 2025, Brendan Carr posted on X in response to a

Washington Post news article about the News Distortion Petition. A true and

correct copy is attached at Exhibit 9 and available at: https://perma.cc/763T-

JJEQ.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day April 27, 2026 in Atlanta, Georgia.

Caitlin Childs

3

# EXHIBIT 1

# DEADLINE

 **PRINT**

# New FCC Chair Revives Complaints About ABC, CBS And NBC Content That His Predecessor Rejected As "At Odds With The First Amendment"

 By **Ted Johnson**
January 22, 2025 1:48pm



**Brendan Carr**
Photo by Alex Wong/Getty Images

Brendan Carr, newly installed as chairman of the FCC under the new Trump administration, is reviving a trio of complaints aimed at NBC, ABC and CBS content, ones that his predecessor dismissed for being "at odds with the First Amendment."

The revived complaints come from the conservative Center for American Rights and generally align with Trump's gripes about media coverage during the 2024 presidential campaign.

The complaints include one against ABC's Philadelphia affiliate, WPVI-TV, alleging bias in ABC's hosting of the September presidential debate; one against WCBS-TV in New York that accuses CBS of "news distortion" in the way that *60 Minutes* edited an interview with Kamala Harris; and another against WNBC-TV in New York for alleged violations of the equal time rule when *Saturday Night Live* featured Harris in a cameo the weekend before the presidential election.

Just last week, before she resigned, FCC chairwoman Jessica Rosenworcel, appointed by President Joe Biden, dismissed the three complaints, as well as another one filed by the Media and Democracy Project, which challenged the license of Fox-owned WTXF-TV in Philadelphia. That complaint alleged

**Add. 32**

that the revelations from the Dominion Voting System defamation case against Fox News showed that Rupert and Lachlan Murdoch lacked the "character" to hold a broadcast license.

Carr's order, however, does not revive the Fox complaint.

In restoring the complaints today, the FCC said that the dismissals were "issued prematurely" and "based on an insufficient investigatory record for the station-specific conduct at issue." The agency said that the complaints require "further consideration."

In her statement last week dismissing the complaints, Rosenworcel said, "The facts and legal circumstances in each of these cases are different. But what they share is that they seek to weaponize the licensing authority of the FCC in a way that is fundamentally at odds with the First Amendment. To do so would set a dangerous precedent." She also warned that the agency "should not be the president's speech police."

When he took office on Monday, Trump signed an executive order on "restoring freedom of speech and ending federal censorship." Among other things, it says that "no taxpayer resources are used to engage in or facilitate any conduct that would unconstitutionally abridge the free speech of any American citizen." The order, though, calls out the Biden administration for "exerting substantial coercive pressure" on social media companies over their content moderation practices.

But as recently as earlier this month, Trump has threatened major media companies over content that he does not like. He warned that Comcast should "pay a big price," as he was irate over something said by NBC's late night host Seth Meyers.

Newsmax first reported on the restored complaints.

During the presidential campaign, Trump sued CBS for $10 billion over the way that *60 Minutes* edited the Harris interview, under Texas' Deceptive Trade Practices Act, a novel application of a law typically directed at false advertising claims. A federal judge in Texas, where the lawsuit was filed, has given Trump until Jan. 24 to respond to CBS' motion to dismiss the case. CBS' attorneys wrote in a filing last month that Trump's "attempts to punish" the network "for their editorial judgments is barred by the First Amendment."

The Center for American Rights also has called for FCC conditions over news coverage to be placed on the pending Skydance-Paramount merger, and Carr has suggested that their *60 Minutes* complaint would be "likely to arise" as the FCC reviews the transaction. The Wall Street Journal reported last week that Paramount Global has had internal discussions about settling the *60 Minutes* lawsuit as one of the options as it tries to secure approval. *60 Minutes* has called claims that it deceitfully edited the Harris interview "false," with a CBS News attorney denying that the network was being deceitful and instead had to truncate the segment for time.

The Center for American Rights and Carr have pointed to the FCC's "news distortion" policy, in which broadcast stations are subject to enforcement only "if it can be proven that they have deliberately distorted a factual news report." But the FCC has not attempted to enforce the policy in decades, per Andrew Jay Schwartzman, senior counsel at the Benton Institute for Broadband and Society.

In a response filed earlier this month, attorneys for Skydance and Paramount Global wrote that news coverage conditions would be "blatantly unconstitutional." They wrote that they were "foreclosed by the First Amendment and unequivocal Supreme Court precedent. All of the Center's complaints about news coverage, debate moderation, and editing of interviews fall squarely within CBS's "editorial discretion in the selection and presentation" of content protected by the First Amendment."

Anna Gomez, one of two Democrats on the commission, said in a statement of the complaints, "The First Amendment is a pillar of American democracy, and our country needs a press free from interference from regulators like me. In fact, the Communications Act explicitly prohibits the

Commission from censoring broadcasters. We must respect the protections of the First Amendment and the restrictions in the Communications Act."

The ABC complaint is over the way that the network handled the September presidential debate against Trump and Harris. Trump had called for ABC to lose its license after he complained of fact-checking done during the debate by the moderators, David Muir and Linsey Davis.

The NBC complaint had to do with the FCC's equal time rule, which requires stations to give candidates equal airtime on non-news programming if requested. The day after the SNL appearance, Trump was given time during NASCAR and NFL coverage. But Carr suggested that, given that Harris was given a cameo so close to the election, other candidates did not have an opportunity to request the time.

**This article was printed from https://deadline.com/2025/01/fcc-complaints-trump-cbs-nbc-abc-1236263995/**



Deadline is a part of Penske Media Corporation. © 2026 Deadline Hollywood, LLC. All Rights Reserved.

**Add. 34**

# EXHIBIT 2



← **Post**

**Brendan Carr** ✓
@BrendanCarrFCC

Comcast outlets spent days misleading the American public—implying that Abrego Garcia was merely a law abiding U.S. citizen, just a regular "Maryland man."

When the truth comes out, they ignore it.

Comcast knows that federal law requires its licensed operations to serve the public interest.  News distortion doesn't cut it.

Abrego Garcia came to America illegally from El Salvador, was validated as a member of the violent MS13 gang—a transnational criminal organization—and was denied bond by an immigration court for failure to show he would not pose a danger to others.

Why does Comcast ignore these facts of obvious public interest?

> **Steven Cheung** ✓ 🏛 @StevenCheung47 · Apr 16, 2025
>
> SHAMEFUL that @CNN and @MSNBC refuses to take Angel Mom Patty Morin as she recounts the terrible tragedy of how an illegal killed her sweet daughter, Rachel.
>
>

6:58 PM · Apr 16, 2025 · **1M** Views

💬 1.1K　　　⟲ 2.7K　　　♡ 7.4K　　　🔖 253　　　↥

💬 **Read 1.1K replies**

**New to X?**

Sign up now to get your own personalized



G  **Sign up with Google**

  **Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of S Privacy Policy, including Cookie Use.

**Relevant people**



**Brendan Carr** ✓
@BrendanCarrFCC
Chairman, Federal Communi
Commission.



**Steven Cheung** ✓ 🏛
@StevenCheung47
Assistant to the President &
House Director of Communic
Personal: @StevenCheung 🏛

**What's happening**

Travel · Trending
**Ford**

Only on X · Trending
**#gachiakuta166**

Trending in United States
**Boycott ABC**

Trending in United States
**Snowflake**

Show more

Terms of Service | Privacy Policy | Cookie P
Accessibility | Ads info | More … | © 2026

**Don't miss what's happening**
People on X are the first to know.

Log in  Sign

# EXHIBIT 3

**Add. 37**

# '60 Minutes' chief producer resigns, citing loss of journalistic freedom

## Bill Owens departs as the show faces continued pressure from President Donald Trump, who sued the network for $20 billion over its interview with Kamala Harris.

Sarah Ellison    April 23, 2025More than 1 year ago



Bill Owens, the longtime executive producer of the storied CBS News show "60 Minutes," stepped aside Tuesday over what he described as a loss of freedom to make independent decisions.

Add. 38

Owens, who spent 24 years at the show described by CBS as "America's most important news program," wrote in a memo to "60 Minutes" staff, a copy of which was obtained by The Washington Post: "Over the past months, it has also become clear that I would not be allowed to run the show as I have always run it. To make independent decisions based on what was right for 60 Minutes, right for the audience."

In an emotional note, he announced he would step aside "so the show can move forward," adding that "60 Minutes" has been "my life."

Wendy McMahon, the president of CBS News and Stations, in a newsroom memo obtained by The Post, praised Owens for being a champion of journalism that "informs, enlightens, and often changes the national conversation."

His departure comes as the show battles ongoing attacks from President Donald Trump, who has sued the network for $20 billion. At the center of the legal battle is a segment from an interview with Kamala Harris that aired in the final weeks of the 2024 presidential campaign, which Trump and his allies allege was deceptively edited to help the Democratic nominee. The Federal Communications Commission had initially rejected a separate complaint on the issue from the conservative law firm Center for American Rights, which has been revived by the new FCC chairman, Brendan Carr.

CBS released the transcripts and internal video footage in February, maintaining that it edited and presented the interview in line with industry standards and did not engage in "deceitful editing."

The New York Times reported this year that Paramount, CBS's parent company, is in early discussions about a possible settlement with Trump.

Last week, the president once again took aim at the show over reporting on

Ukraine and Greenland, and said the network should lose its license. "CBS is out of control, at levels never seen before, and they should pay a big price for this," he wrote on Truth Social.

The show has also faced internal scrutiny recently. Paramount owner Shari Redstone objected to a "60 Minutes" segment to a CBS executive, and soon after, Susan Zirinsky, the former president of CBS News, was placed in a role overseeing Owens, according to a person familiar with the events who spoke on the condition of anonymity because they were not authorized to speak about internal matters. Owens chafed at that, the person added.

Paramount Global is seeking a merger with Skydance Media and is awaiting approval from the FCC. As the proposed deal has stalled, CBS staff members are increasingly worried that Redstone will do whatever it takes to get it to go through, said two people familiar with the events who also were not authorized to speak about internal matters.

"60 Minutes" premiered in 1968 and is known for its in-depth investigations, incisive profiles and interviews with global newsmakers. The show has won 25 Peabody swards and multiple news and documentary Emmys.

In his memo to staffers, Owens said "60 Minutes" will continue to cover the new administration, report from war zones and investigate injustices. "In short, 60 Minutes will do what it has done for 57 years," he wrote.

# EXHIBIT 4

USCA Case #26-1099      Document #2171163      Filed: 04/28/2026      Page 44 of 65

*Blog*

# M&A in the Spotlight: Skydance, Paramount and the Politics of Media Power

📅 *August 4, 2025*      *IMAA*



**When the $8 billion Skydance-Paramount deal closes on August 7, it won't just be another media merger. The transaction exposes three fundamental changes hitting the entertainment industry: regulators now demand political loyalty for deal approval, streaming services are abandoning the direct-to-consumer dream for wholesale bundling, and private equity turnaround models have become the only viable rescue option for dying legacy media companies.**

(Page 44 of Total)

https://imaa-institute.org/blog/skydance-paramount-and-the-politics-of-media-power/

# Deal Architecture: A Masterclass in Asymmetric Control

The Skydance-Paramount structure demonstrates sophisticated financial engineering designed to maximize control while minimizing cash outlay. The transaction unfolds across two phases: first, David Ellison's investor group acquires Shari Redstone's National Amusements for $2.4 billion, securing 77.4% voting control despite holding less than 10% economic stake. Second, an all-stock merger values Skydance at $4.75 billion while injecting $1.5 billion in fresh capital and providing $4.5 billion in shareholder liquidity.

This dual-phase approach mirrors strategies increasingly common in distressed situations where controlling stakes trade at significant discounts to enterprise value. The structure preserves Paramount's public listing—critical for maintaining debt capital market access—while delivering Ellison family control at a fraction of what an outright acquisition would cost. For corporate development teams evaluating similar opportunities, the precedent shows how creative structuring can unlock value in complex ownership situations involving dual-class shares and legacy family control.

The financing mix tells an equally compelling story. With Paramount carrying $14.6 billion in debt and Moody's placing the rating on downgrade watch, the deal essentially represents a private equity-style rescue financing. RedBird Capital's participation signals sophisticated investors' appetite for distressed legacy media assets when paired with operational expertise and cost-cutting discipline. The target of $2 billion in annual synergies—identified with Bain & Company's assistance—represents roughly 15% of combined revenues, an aggressive but achievable benchmark for media consolidation.

# Regulatory Capture and the New Approval Playbook

The FCC's conditional approval breaks new ground in regulatory overreach, conditioning the merger on two unprecedented commitments: eliminating DEI initiatives at both companies and appointing a CBS ombudsman to investigate "bias" for at least two years. These mandates, pushed through on a 2-1 Republican vote, represent a fundamental shift from content-neutral licensing review to explicit editorial control.

The political backdrop cannot be ignored. Paramount's $16 million settlement of Donald Trump's 60 Minutes lawsuit preceded the FCC vote by mere weeks, with Trump subsequently claiming an additional $20 million worth of advertising commitments from the merged entity. This sequence illustrates how regulatory approval increasingly depends on political accommodation rather than traditional antitrust or public interest analysis.

For dealmakers, the implications extend well beyond media. The precedent signals that industries requiring regulatory approval—telecommunications, energy, transportation—may face similar political litmus tests. T-Mobile, Verizon, and Disney have already begun curtailing diversity programs in anticipation of regulatory scrutiny. The lesson is clear: political risk assessment must now incorporate ideological alignment with the regulatory environment, fundamentally altering how companies approach government relations and stakeholder management.

# Strategic Rationale: Beyond Financial Engineering

Strip away the political theater, and the Skydance-Paramount combination addresses genuine strategic imperatives. Paramount's linear television assets continue generating cash flow but face secular decline, while Paramount+ achieved 77.5 million subscribers but lost $497 million in 2024. The platform needs scale, cost discipline, and differentiated content to reach profitability—precisely what the Skydance combination promises to deliver.

Ellison's vision of a "world-class media and technology enterprise" leverages his family's Oracle connection for cloud infrastructure and AI-driven content workflows. While ambitious, this tech-enabled approach reflects industry-wide recognition that traditional media companies must transform their operating models to compete with digital natives. The integration of Skydance's existing franchise relationships—Top Gun, Mission: Impossible, Transformers—simplifies profit participation structures and accelerates sequel development, addressing one of Hollywood's most persistent inefficiencies.

**Add. 44**

The streaming strategy particularly merits attention. Rather than pursuing the standalone direct-to-consumer model that has burned billions across the industry, New Paramount appears positioned to embrace bundling and wholesale distribution. The company's partnerships with Walmart+, Verizon, and Amazon Channels reflect broader industry migration toward aggregated platforms where consumers access multiple services through single interfaces. AlixPartners projects 60-70% of streaming subscriptions will be purchased via bundles by 2026, making early positioning critical for long-term viability.

# Market Implications: Consolidation Accelerates

The Skydance-Paramount approval opens floodgates for media consolidation that has been building for years. With Trump-era deregulatory policies taking effect, analysts project double-digit percentage growth in entertainment M&A activity. Lionsgate, AMC Networks, and Roku top the target list, while private equity firms circle distressed traditional broadcasters trading at significant discounts to their content library values.

The transaction validates several emerging trends. First, the combination of operational expertise with distressed legacy assets can create significant value through cost rationalization and strategic refocusing. Second, vertical integration between content production and distribution remains attractive despite previous regulatory skepticism. Third, family-controlled media empires built during the broadcast era lack the capital and expertise necessary for streaming competition, creating ongoing divestment opportunities.

For the streaming wars specifically, the deal reshuffles competitive dynamics. New Paramount ranks fourth by enterprise value behind Netflix, Disney, and Warner Bros. Discovery, but its combined content library and distribution relationships provide meaningful bargaining power with advertisers and international platforms. The company's sports rights portfolio—NFL and NCAA through CBS—becomes increasingly valuable as live programming drives subscriber acquisition and retention.

USCA Case #26-1099     Document #2171163     Filed: 04/28/2026     Page 48 of 65

# Cost Synergies and the Bain Playbook

The $2 billion annual cost target deserves scrutiny given Paramount's history of failed restructuring attempts. Bain's involvement suggests a systematic approach focusing on overlapping functions, real estate rationalization, and technology consolidation. With approximately 18,600 global employees, the company has already executed 15% layoffs in 2024 and another 3.5% in early 2025, but deeper reductions appear inevitable.

The synergy realization timeline—half in year one, full run-rate within 24 months—aligns with private equity best practices for operational improvement. Key areas likely include consolidating production facilities, eliminating duplicate corporate functions, renegotiating supplier contracts, and optimizing the linear television footprint through channel disposals or affiliate fee reductions. The challenge lies in execution without undermining content quality or talent retention, particularly given the DEI rollback's potential impact on creative pipeline development.

Real estate rationalization presents immediate opportunities. Paramount's sprawling studio lots and office complexes represent significant fixed costs that can be optimized through sale-leaseback arrangements or outright disposals. The company's international footprint also offers consolidation potential, particularly in markets where local production requirements have diminished.

# Risk Factors and Execution Challenges

Several risks threaten the deal's success beyond typical integration challenges. Cultural integration poses particular concerns given the DEI mandate's potential impact on talent retention and creative output. Hollywood's workforce skews liberal, and prominent departures could undermine content quality and brand positioning with younger demographics who increasingly value corporate social responsibility.

Credit markets present another challenge. Paramount's debt burden requires deleveraging from 4.3x to 2.4x net debt-to-EBITDA by 2026 to achieve investment-grade status. This target assumes successful synergy realization and stable cash flow generation from declining linear assets—both significant execution risks. Moody's warning that the merger "may not stabilize the credit profile" reflects these concerns and suggests potential downgrades if operational improvements disappoint.

(Page 48 of Total)

**Add. 46**

USCA Case #26-1099    Document #2171163    Filed: 04/28/2026    Page 49 of 65

The streaming profitability timeline also remains uncertain. Paramount+ faces intensifying competition from Netflix, Disney+, and emerging players while content costs continue rising. The platform's path to domestic profitability by 2025 depends on subscriber growth, reduced churn, and improved advertising revenues — all challenging in an increasingly saturated market.

# Broader Implications for M&A Practice

The Skydance-Paramount transaction establishes several precedents relevant across industries. The dual-phase structure offers a template for acquiring control of complex, multi-stakeholder organizations while preserving public market access. The political risk dimension highlights how regulatory approval increasingly depends on ideological alignment rather than traditional competition analysis.

For corporate development professionals, the deal underscores the importance of thorough political risk assessment in transaction planning. Companies pursuing deals requiring regulatory approval must now consider not just economic merits but political positioning and stakeholder alignment with prevailing regulatory philosophy. This adds complexity to due diligence processes and may favor larger, more politically connected acquirers.

The cost synergy targets also reflect industry-wide pressure for operational efficiency as growth-driven strategies prove insufficient for achieving profitability. The Bain playbook — systematic function-by-function analysis, aggressive timeline targets, and data-driven decision making — likely becomes the standard approach for turnaround situations across media and other declining industries.

# Looking Forward: Scenarios and Strategic Responses

Three scenarios emerge for New Paramount's trajectory through 2028. The base case (55% probability) assumes successful integration, 20% EBITDA improvement, and domestic streaming profitability, setting

USCA Case #26-1099      Document #2171163      Filed: 04/28/2026      Page 50 of 65

a template for private equity-backed media turnarounds. The bull case (20% probability) envisions Oracle cloud partnerships and AI efficiencies driving faster margin expansion and subscriber growth to 110 million globally. The bear case (25% probability) involves advertising recession, accelerated cord-cutting, and talent flight from DEI rollbacks, potentially triggering asset fire-sales and domino downgrades across the sector.

For industry participants, the deal's completion signals fundamental shifts requiring strategic adaptation. Content creators must evaluate the benefits of scale versus independence, while distributors face pressure to develop bundling partnerships and wholesale relationships. Investors should reassess media valuations given the new regulatory environment and consolidation momentum, while talent agencies must navigate changing studio dynamics and political considerations affecting content development.

The Skydance-Paramount merger ultimately represents more than media consolidation—it embodies the convergence of financial engineering, political influence, and operational discipline necessary for legacy industry transformation. Success would validate the hybrid model of private equity rigor and Silicon Valley innovation applied to traditional content assets. Failure could accelerate the sector's march toward further consolidation under cash-rich technology companies or fragmentation into specialized content creators. Either way, the deal establishes a new playbook for navigating regulatory capture, executing complex turnarounds, and competing in the attention economy's next phase.

The transaction's broader implications extend well beyond Hollywood, offering insights into how political polarization reshapes business strategy, regulatory approval processes, and stakeholder capitalism. For dealmakers across industries, the lessons are clear: political risk assessment is now central to transaction planning, operational improvement drives value creation in declining sectors, and successful integration requires balancing efficiency gains with talent retention and brand positioning. The Skydance-Paramount deal may be entertainment industry-specific, but its strategic and regulatory precedents will influence M&A practice across the economy for years to come.

• • •

**The Skydance-Paramount merger is reshaping Hollywood and setting the pace for how deals will get done in the new media landscape. Our latest blog goes beyond the**

(Page 50 of Total)

**Add. 48**

USCA Case #26-1099      Document #2171163      Filed: 04/28/2026      Page 51 of 65

**headlines to explain why this transaction matters for anyone watching business, politics, or the future of streaming.**

- **The rise of political approval as the new test for major mergers**
- **Why streaming platforms are switching to bundles and wholesale partnerships**
- **The real story behind private equity's role in rescuing legacy media**

*TAGS:*
- **What this means for the next wave of industry consolidation and dealmaking**

**Dive in for a clear-eyed take on what's changing in media, and why every strategist**

  *media M&A*  *political risk in deals*  *private equity media deals*

*SHARE:*

# EXHIBIT 5

**Add. 50**

# SKYDANCE

July 22, 2025

**VIA ECFS**

The Honorable Brendan Carr
Chairman
Federal Communications Commission
45 L Street, N.E.
Washington, D.C. 20554

      **Re: MB Docket No. 24-275**

Dear Chairman Carr:

On behalf of Skydance Media (Skydance), in connection with our pending applications seeking approval for the transfer of control of Paramount Global (Paramount), I write to address concerns about media bias that have been raised in the record of this proceeding.[1]

As Skydance has made clear in the record, we "recognize the importance of unbiased journalism and are fully committed to presenting a diverse array of viewpoints on television."[2]  We further reaffirm that, after consummation of the proposed transaction, New Paramount's new management will ensure that the company's array of news and entertainment programming embodies a diversity of viewpoints across the political and ideological spectrum, consistent with the varying perspectives of the viewing audience.  Skydance recognizes that, as a broadcast licensee, it will be charged with operating in the public interest, and the company intends to undertake a comprehensive review of CBS and to make any necessary changes to ensure compliance with that standard.  In all respects, Skydance will ensure that CBS's reporting is fair, unbiased, and fact-based.

Moreover, Skydance reaffirms its commitment to localism as a core component of the public interest standard.  Indeed, the CBS affiliate network's over 200 local broadcast stations provide service throughout the country and are a trusted voice in local markets big and small.  The value

---

[1] *See, e.g.*, Petition To Condition Grant by the Center for American Rights, *In the Matter of Skydance Media and Paramount Global*, MB Docket No. 24-275, at 8 (filed Dec. 16, 2024) ("CAR Petition")(calling on the Commission "to press the owners of New Paramount to commit to viewpoint diversity").

[2] Consolidated Opposition to Petitions and Response to Comments, *In the Matter of Skydance Media and Paramount Global*, MB Docket No. 24-275, at 9 (Jan. 2, 2025).

**Add. 51**

of these stations in their local communities cannot be overstated, and Skydance will work closely with its affiliated broadcast stations to ensure a productive partnership, including by considering technological improvements, investments in local news resources, and other measures that bolster local broadcasting.

To promote transparency and increased accountability, Skydance also will commit, for a period of at least two years, to have in place an ombudsman who reports to the President of New Paramount, who will receive and evaluate any complaints of bias or other concerns involving CBS. New Paramount's executive leadership will carefully consider any such complaints in overseeing CBS's news programming. In evaluating Comcast's acquisition of NBCUniversal, the Commission found such a mechanism effective in preventing editorial bias in the operation of the NBC broadcast network.[3]

Skydance believes that its acquisition of Paramount will generate significant efficiencies and have a substantial positive impact on the future of broadcasting. We submit that these voluntary commitments should provide comfort that New Paramount will operate the CBS Network in a manner consistent with the public interest.

Respectfully submitted,

Stephanie Kyoko McKinnon
General Counsel and Co-President of Business Operations

---

[3] *Applications of Comcast Corporation General Electric Company and NBC Universal, Inc.*, Memorandum Opinion and Order, 26 FCC Rcd 4238, ¶ 207 (2011). Any complaints and broader concerns regarding news distortion should be addressed in separate proceedings, and not in connection with this transaction. *See, e.g., FCC Establishes MB Docket No. 25-73 and Comment Cycle for News Distortion Complaint Involving CBS Broadcasting Inc., Licensee of WCBS, New York, NY*, Public Notice, DA 25-107 (Feb. 5, 2025 MB).

**Add. 52**

# EXHIBIT 6

## OFFICE OF CHAIRMAN BRENDAN CARR

# FCC Approves Skydance's Acquisition of Paramount CBS

*Skydance Commits to Viewpoint Diversity, Nondiscrimination, and Enhanced Localism at CBS*

WASHINGTON, July 24, 2025—Today, the FCC approved Skydance's $8 billion acquisition of Paramount Global and its subsidiaries, including the ultimate parent company of the CBS network of owned and operated broadcast television stations, by granting a series of applications that transfer FCC licenses and authorizations.

**Chairman Carr issued the following statement:**

"Americans no longer trust the legacy national news media to report fully, accurately, and fairly. It is time for a change. That is why I welcome Skydance's commitment to make significant changes at the once storied CBS broadcast network. In particular, Skydance has made written commitments to ensure that the new company's programming embodies a diversity of viewpoints from across the political and ideological spectrum. Skydance will also adopt measures that can root out the bias that has undermined trust in the national news media. These commitments, if implemented, would enable CBS to operate in the public interest and focus on fair, unbiased, and fact-based coverage. Doing so would begin the process of earning back Americans' trust. Today's decision also marks another step forward in the FCC's efforts to eliminate invidious forms of DEI discrimination. And Skydance's commitment to enhancing local news and reporting—coverage valued by the public—will also inure to the benefit of the American people."

**Commitment to Unbiased Journalism**. Skydance has made written commitments to ensuring that the new company's array of news and entertainment programming will embody a diversity of viewpoints across the political and ideological spectrum and that CBS's reporting will be fair, unbiased, and fact-based. To promote transparency and increased accountability, Skydance commits, for a period of at least two years, to have in place an ombudsman who will report to the President of New Paramount and evaluate complaints of bias.

**Ensures that Discriminatory DEI Policies End.** Skydance, which has no DEI programs in place today, has committed that it will not establish any such initiatives at the new company and confirms that New Paramount will also be committed to equal opportunity employment and nondiscrimination. This will ensure that the combined business will enact policies and practices consistent with the law and the public interest.

**Injection of New Capital and Enhanced Local News**. Approving this transaction will unleash the investment of $1.5 billion into Paramount, bolstering all aspects of its operations, including broadcast. Skydance also reaffirms its commitment to localism as a core component of the public interest standard, and emphasizes that it will work closely with its affiliated broadcast stations to ensure a productive partnership that will strengthen its affiliates' ability to serve their local communities.

###

**Media Contact: MediaRelations@fcc.gov / (202) 418-0500**
**@FCC / www.fcc.gov**

*This is an unofficial announcement of Commission action.  Release of the full text of a Commission order constitutes official action.  See MCI v. FCC, 515 F.2d 385 (D.C. Cir. 1974).*

**Add. 55**

# EXHIBIT 7

← **Post**

**Brendan Carr** ✓
@BrendanCarrFCC

Broadcasters that are running hoaxes and news distortions - also known as the fake news - have a chance now to correct course before their license renewals come up.

The law is clear.  Broadcasters must operate in the public interest, and they will lose their licenses if they do not.

And frankly, changing course is in their own business interests since trust in legacy media has now fallen to an all time low of just 9% and are ratings disasters.

The American people have subsidized broadcasters to the tune of billions of dollars by providing free access to the nation's airwaves.

It is very important to bring trust back into media, which has earned itself the label of fake news.

When a political candidate is able to win a landslide election victory after in the face of hoaxes and distortions, there is something very wrong.  It means the public has lost faith and confidence in the media.  And we can't allow that to happen.

Time for change!

---



**Rapid Response 47** ✓ ▪ @RapidResponse47 · Mar 14

**Donald J. Trump** ✓ ➕
@realDonaldTrump

Yet again, an intentionally misleading headline by the Fake News Media about the five tanker planes that were supposedly struck down at an Airport in Saudi Arabia, and of no further use. In actuality, the Base was hit a few days ago, but the planes were not "struck" or "destroyed." Four of the five had virtually no damage, and are already back in service. One had slightly more damage, but will be in the air shortly. None were destroyed, or close to that, as the Fake News said in headlines. The New York Times and The Wall Street Journal (in particular), and other Lowlife "Papers" and Media actually want us to lose the War. Their terrible reporting is the exact opposite of the actual facts! They are truly sick and demented people that have no idea the damage they cause the United States of America. Fortunately, as proven by our Great and Conclusive Election Win in 2024, the People of our Country understand what is happening far better than the Fake News Media! President DONALD J. TRUMP

12:24 PM · Mar 14, 2026 · **9.6M** Views

💬 12K        ⟲ 8.2K        ♡ 19K        🔖 1.7K        ↑

💬 **Read 12.4K replies**

---

**New to X?**

Sign up now to get your own personalized

 **Sign up with Google**

 **Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of S…
Privacy Policy, including Cookie Use.

**Relevant people**

 **Brendan Carr** ✓
@BrendanCarrFCC
Chairman, Federal Communi…
Commission.

 **Rapid Response …** ✓ ▪
@RapidResponse47
Official White House Rapid R…
account. Supporting @POTU…
America First agenda and ho…
Fake News accountable. MA…

**What's happening**

Trending in United States
**Cash App**

Entertainment · Trending
**Clayface**
Trending with  Matt Reeves

Trending in United States
**Oona**

Technology · Trending
**Storage Wars**
Trending with  Darrell Sheets

**Show more**

Terms of Service  |  Privacy Policy  |  Cookie P…
Accessibility  |  Ads info  |  More …  |  © 2026…

**Don't miss what's happening**
People on X are the first to know.

Add. 57

Log in        Sign …





**Don't miss what's happening**
People on X are the first to know.

Log in

Sign

# EXHIBIT 8

### New to X?

Sign up now to get your own personalized



Sign up with Google

Sign up with Apple

Create account

By signing up, you agree to the Terms of S
Privacy Policy, including Cookie Use.

← **Post**  ...

**Brendan Carr** ✔
@BrendanCarrFCC

How about no

On my watch, the FCC will continue to hold broadcasters accountable to their public interest obligations.

And it is quite rich for the exact same people that pressured prior FCCs to censor conservatives *through the news distortion policy* to now object to the agency's even-handed application of the law.

> **NBC News** ✔ @NBCNews · Nov 13, 2025
> A bipartisan group of former FCC leaders petitions the agency to repeal the policy the Trump administration invoked in discussions surrounding Jimmy Kimmel at ABC and in the investigation of "60 Minutes" at CBS.
> nbcnews.com/tech/tech-news...

2:36 PM · Nov 13, 2025 · **153.3K** Views

💬 192        🔁 691        ♡ 2.8K        🔖 51        ⬆️

💬 Read 192 replies

### Relevant people

**Brendan Carr** ✔
@BrendanCarrFCC
Chairman, Federal Communi
Commission.

**NBC News** ✔
@NBCNews
News updates from around t
day, every day.

### What's happening

Trending in United States
**Cash App**

Entertainment · Trending
**Clayface**
Trending with Matt Reeves

Trending in United States
**Oona**

Technology · Trending
**Storage Wars**
Trending with Darrell Sheets

Show more

Terms of Service  |  Privacy Policy  |  Cookie P
Accessibility  |  Ads info  |  More ···  |  © 2026

**Don't miss what's happening**
People on X are the first to know.

**Add. 60**
Log in    Sign



**Don't miss what's happening**
People on X are the first to know.

Log in

Sign

Add. 61

# EXHIBIT 9

**Add. 62**



# Post ←

**Brendan Carr** ✓
@BrendanCarrFCC

👎



**The Washington Post** ✓
@washingtonpost

**𝕏.com**

Seven former members of the FCC are petitioning the agency to repeal its policy prohibiting broadcasters from distorting the news, arguing that FCC Chairman Brendan Carr has improperly wielded it to counter material critical of President Trump.

Brendan Carr should ditch speech-chilling policy, former FCC...

From washingtonpost.com

2:30 PM · 11/13/25 · 32K Views

2:12 PM · Nov 14, 2025 · **26.8K** Views

💬 102          ⟲ 122          ♡ 680          🔖 13          ⬆️

💬 Read 102 replies

## New to X?

Sign up now to get your own personalized

🅖 Sign up with Google

 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of S
Privacy Policy, including Cookie Use.

### Relevant people

**Brendan Carr** ✓
@BrendanCarrFCC
Chairman, Federal Communi
Commission.

### What's happening

Trending in United States
**Cash App**

Entertainment · Trending
**Clayface**
Trending with Matt Reeves

Trending in United States
**Oona**

Technology · Trending
**Storage Wars**
Trending with Darrell Sheets

Show more

Terms of Service | Privacy Policy | Cookie P
Accessibility | Ads info | More ⋯ © 2026

**Don't miss what's happening**
People on X are the first to know.

**Add. 63**

Log in          Sign